MORAN v. STATE BANKING COMMISSIONER.

1. Banks and Banking—New Bank—Necessity—Finding of Commissioner.

In suit to review action of State banking commissioner denying application to him for permission to organize a State bank with capital of $2,500,000 and to be located in large office building in quarters already well equipped for operation of a bank under a favorable lease in city with 1940 population of 1,623,452 and in which there are 6 parent banks with 99 branches engaged in commercial banking, city has largest deposits per bank of any city of corresponding size, except two in the United States, the percentage proportion of bank capital to deposits was lower than in the other large cities with one exception and the percentage debit increase for recent year was higher than in any of the larger cities, commissioner's finding that there was no necessity for such new bank *held*, error under evidence presented (Act No. 341, § 26, Pub. Acts 1937).

References for Points in Headnotes
[1, 4] 7 Am. Jur., Banks, § 28.
[3] 50 Am. Jur., Statutes, § 292.
[5] 7 Am. Jur., Banks, § 9.
[6, 13] 7 Am. Jur., Banks, § 10.

2. SAME—CONSTRUCTION OF STATUTES—NECESSITY.

In considering statute requiring State banking commissioner to make a finding of necessity before permitting organization of a new bank, a construction that there must be an "absolute" need was too rigid a construction (Act No. 341, § 26, Pub. Acts 1937).

3. STATUTES—CONSTRUCTION.

The subject matter of a statute must be given consideration in determining the legislative intent in making use of words contained therein.

4. BANKS AND BANKING—NEW BANK—NECESSITY—STATUTES.

Where it appears there were already 6 parent banks with 99 branches in city with 1940 population of 1,623,452, that several branches had recently been authorized, finding of State banking commissioner that there was no statutory necessity for organization of a new bank providing additional capital was untenable as tending to an undesirable monopolistic condition in the particular banking field (Act No. 341, § 26, Pub. Acts 1937).

5. CONSTITUTIONAL LAW—GENERAL WELFARE—POLICE POWER—REGULATION OF BANKING.

The business of banking is so intimately connected with the general welfare of the public that it may be constitutionally regulated under the police power.

6. SAME—REGULATION OF BANKING—STATUTES—GENERAL WELFARE.

A State statute regulating the business of banking may not deter competition or foster monopoly but must guard the public and public interests against imprudent banking.

7. BANKS AND BANKING—NEW BANK—NECESSITY—CONVENIENCE.

While mere convenience is not sufficient to satisfy the statutory requisite of necessity for the organization of a new State bank in a community, it may be considered in supplementation of proof of facts and circumstances showing necessity (Act No. 341, § 26, Pub. Acts 1937).

8. SAME—NEW BANK—CONSTRUCTION OF STATUTE—NECESSITY.

Since the primary function of banking facilities involves the welfare and convenience of the portion of the public concerned, it would seem reasonably to follow that necessity, as used in statute providing for organization of a new bank, was not intended by the legislature to mean absolute or indispensable need (Act No. 341, § 26, Pub. Acts 1937).

9. Words and Phrases—Necessity.

In construing the word necessity, it is not always used as meaning indispensable or imparting an absolute physical necessity but means no more than that one thing is convenient, or useful, or essential to another.

10. Same—Construction of Words—Common Usage.

It is essential to just construction, that many words which import something excessive, should be understood in a more mitigated sense—in that sense which common usage justifies and the word "necessity" is such a word.

11. Banks and Banking—New Bank—Finding as to Likelihood of Successful Operation—Record.

Denial of application for organization of new State bank on ground that State banking commissioner was not "convinced of the likelihood of its successful operation if established" *held*, unreasonable and contrary to the intent of the statute under record presented (Act No. 341, § 26, Pub. Acts 1937).

12. Appeal and Error—Financial Institutions Act—Scope of Review.

Under the financial institutions act, there is a much broader judicial review of the action taken by the administrative agency than where there is certiorari direct from an administrative agency's order to the Supreme Court (Act No. 341, § 21, Pub. Acts 1937).

13. Constitutional Law—Regulation of Banking—Review of Action by State Banking Commissioner.

While the power to regulate the business of banking is vested by law in the State banking commissioner, the legality and reasonableness of his action pursuant to legal rules or guides through which this power is exercised constitute judicial questions beyond the power of the legislature to foreclose (Act No. 341, § 21, Pub. Acts 1937).

14. Appeal and Error—Scope of Review under Financial Institutions Act—Orders.

Under the financial institutions act, a chancery court reviewing action of the State banking commissioner, claimed by a party in interest to be unlawful or unreasonable, is authorized "to make such other order or decree as the court shall decide to be proper and in accordance with the facts and the law" (Act No. 341, § 21, Pub. Acts 1937).

15. COSTS—MISTAKE OF LAW—STATE BANKING COMMISSIONER.

No costs are allowed in suit to set aside State banking commissioner's denial of application to organize a new bank, where action taken apparently resulted from a mistaken interpretation of applicable law (Act No. 341, § 26, Pub. Acts 1937).

Appeal from Ingham; Hayden (Charles H.) J. Submitted June 15, 1948. (Docket No. 55, Calendar No. 44,119.) Decided September 8, 1948.

Bill by J. Bell Moran and others against E. William Nelson, State Banking Commissioner, to review his action in denying a charter to a new bank to be located in Detroit. Decree for defendant. Plaintiffs appeal. Reversed.

*Bratton & Bratton* (*Kelly, Kelly & Kelly, A. W. Sempliner,* and *Lewis Brooke,* of counsel), for plaintiffs.

*Eugene F. Black,* Attorney General, *Edmund E. Shepherd,* Solicitor General, and *James A. Greene* and *Elbern Parsons,* Assistants Attorney General, for defendant.

NORTH, J. Following some preliminary interviews with the defendant State banking commissioner, plaintiffs in July, 1947, made application to the banking commissioner for a State bank charter, the contemplated bank to be located in the Penobscot building in Detroit, and to have a "capital of $2,500,000 or more." On September 18, 1947, the banking commissioner denied plaintiffs' application. Thereafter, pursuant to the statutory provision (Act No. 341, § 21, Pub. Acts 1937 [Comp. Laws Supp. 1940, § 11897-21, Stat. Ann. 1943 Rev. § 23.-739]), plaintiffs brought suit in Ingham county circuit court in chancery, and sought the following relief:

"That the action of the defendant as commissioner of the State banking department be fully reviewed by this Court, and that his order denying the application for permission to organize a State bank be vacated and set aside. * * *

"That this Court by its decree, order and determine that the application heretofore made to the defendant, commissioner of the State banking department should be granted; that the defendant be required to approve plaintiffs' application."

After hearing in the chancery court wherein testimony was taken at length, the relief sought was denied and plaintiffs' bill of complaint dismissed. Plaintiffs have appealed.

The relief which courts may grant to a party who feels that the commissioner's determination is "unlawful or unreasonable" is provided in the statute quoted near the close of our opinion. Upon receipt of a petition of the character here involved accompanied by the requisite information, the statute provides:

"The commission (commissioner) shall verify the information and statements contained in the application, * * * as well as make any other or further investigation as to the persons, conditions, and circumstances surrounding or in any manner affecting or pertaining to the organization of such bank, sufficient to satisfy the commission (commissioner) as to the responsibility and fitness of the applicants, the necessity for the organization of the bank, and the likelihood of its successful operation. If the commission (commissioner) is so satisfied, it (he) shall approve such application and shall notify such applicants of its (his) approval. * * *

"If the commission (commissioner) is not satisfied as to the responsibility and fitness of said applicants, the necessity for such bank, or the likelihood of its successful operation, it (he) shall disapprove the application." Act No. 341, § 26, Pub. Acts 1937

(Comp. Laws Supp. 1940, § 11897–26, Stat. Ann. 1943 Rev. § 23.754).

It is agreed that the defendant does not question "the responsibility and fitness of the applicants" in this case, but in his letter denying the application the banking commissioner said:

"You are advised that after due and detailed consideration of the application above referred to, it is my conclusion that there is no present existing necessity for the organization and establishment of an additional bank in the city of Detroit, nor am I convinced of the likelihood of its successful operation if established.

"Accordingly, said application is hereby denied."

Hence, decision herein turns upon whether or not, under the record, the defendant banking commissioner was in error in denying plaintiffs' application either on the ground (1) that no necessity exists for the establishment of another bank in Detroit, or (2) because "the likelihood of its successful operation if established" was not shown.

NECESSITY. On this phase of the case both the factual situation and the proper construction to be given to the word "necessity" as used in the statute must be considered. As to the need or necessity in Detroit of another bank, plaintiffs have made such an extensive showing that, within permissible bounds of our opinion, it is not possible to review it in detail. We shall note briefly only certain portions of such testimony.

In part the facts and circumstances bearing upon necessity, and to some extent upon successful operation, of a new bank disclosed by the record are as follows: Since 1938 no new bank, other than branch banks, has been established in Detroit, which is the fourth largest city in the United States and which in recent years has experienced a large increase in

population, and also a substantial growth particularly during the last four or five years in general business, including banking business; and further there is testimony as to "confidence that Detroit \* \* \* will continue to grow." In 1940 Detroit had a population of 1,623,452 as shown by the 1940 Federal census. At the present time in Detroit, which has an estimated population of 1,825,000, there are 12 separate banking institutions, but because of the limited and specialized character of the business of some of such institutions, there are in Detroit only six banks and their branch institutions which are engaged in commercial banking. There are 99 branch banks, six of which are located outside the city limits.

From statistics in the record, which are conceded to be substantially correct and which relate to banking conditions in 30 cities each of which had total deposits of $500,000,000 or more as of June 30, 1947, the following appears. Only one other of such cities has as few as six commercial banks. Chicago has 70 commercial and savings banks. Even on the basis of its 1940 population Detroit with six commercial banking units has only one such unit to a population of approximately 270,000, and presently there is a substantially greater population per bank. This population per commercial banking unit in Detroit is much larger than in any of the other 30 cities, where the average population per bank is 41,677. Aside from two of the 30 cities where there are some exceptional attendant circumstances, Detroit has the largest deposits per bank. With one exception the percentage proportion of bank capital to deposits was lower in Detroit than in any other of these cities, where the average was 8.25 per cent. The noted statistics give the Detroit proportion as 4.97 per cent., but in defendant's testimony it is given as

4.67 per cent. This capital protection for Detroit depositors, as disclosed by defendant's proofs, "is low compared to the average in the 7th Federal Reserve District and for the nation as a whole." In the year period ending October 1, 1947, the percentage of debit increase in Detroit banks was 27.8 per cent, which was substantially higher than in any of the other 30 cities. Touching this latter item, Mr. Joseph Verhelle testified:

"Then we took what, after all, is the real cream of the statistics, * * * bank debits, because we feel that it is proper to state that they are a measurement of business and industrial gauge; that is, bank debits are simply the total dollar value of the checks that people cash, and if those checks go up, or if they go down, you know that business is going up or down. They are a rather accurate barometer."

The record also shows that the banking needs of Detroit and the immediate vicinity have resulted in the organization by the six chartered parent banks of 99 branch banks. In testifying, defendant admitted that in his opinion the additional organization of another bank in Detroit would not "affect the capital structure or the solvency of the existing banks."

While we do not deem it of great weight as bearing upon the issue of "necessity," though it merits some consideration, the record also discloses that the proposed bank would have a long-term lease on favorable conditions of existing banking quarters in the Penobscot building, centrally located in the city's financial district, which are not surpassed by those occupied by any other Detroit bank. These quarters, designed for bank occupancy, contain vaults, equipment and bank fixtures, including safety deposit boxes which are presently in use. The foregoing equipment is said to represent an investment of approximately $2,000,000; and needs only to be sup-

plemented by necessary furnishings and equipment for banking purposes. The Penobscot building is considered an outstanding Detroit office building wherein are housed in their business activities between 4,000 and 5,000 persons, and the building is daily frequented by between 40,000 and 50,000 people. Presently no bank is located in the Penobscot building, although there are several banks in the immediate locality.

It is pertinent at this point to quote from the testimony of Mr. Walter S. McLucas, chairman of the board of the National Bank of Detroit, as follows:

"I think in Detroit it (banking business) is particularly on a sound basis, and a basis that under present conditions is profitable to the banks. The banks are all expanding in their facilities and quarters, spending vast amounts of money, in the last few years for this growth in business; and I think that they have excellent prospects of profitable—sound and profitable operations. * * *

"Q. * * * Now, taking into consideration the answer to the two previous questions in regard to the growth of the city of Detroit during the last particularly four or five years, in population and the business growth, the banking growth, the banking future of Detroit, would you say that the establishment of another commercial bank in Detroit would be a convenience and for the benefit of the public?

"A. That's a question, I think—the answer to that question is that it would. * * *

"In giving my opinion on direct examination that the placing of a bank in the Penobscot building would offer a service and convenience to the people, I had in mind the existence of other banks in close proximity to the Penobscot building. I know they are there. They are all our competitors, and even though a new bank that came into that Penobscot building would add one more competitor, I still am of the opinion that it would be a convenience for the

public. * * * I think the Penobscot building is the largest office building in Detroit. In my opinion, a bank there would add convenience to the public and would not destroy the financial stability of the other banks in Detroit."

Incident to passing upon plaintiffs' petition the banking commissioner, as he is authorized to do by the statute (Act No. 341, § 26, Pub. Acts 1937 [Comp. Laws Supp. 1940, § 11897–26, Stat. Ann. 1943 Rev. § 23.754]), caused an independent investigation to be made by two of his bank examiners. The defendant banking commissioner took into consideration the report of his two examiners, as well as other information contained in the records of his department. While the report of these two examiners contains some information, which we are about to note in part, in addition to that hereinbefore noted as appearing in the record, we do not find, in the main, serious conflict between the material facts in this report and the facts as presented by plaintiffs. However, the report of the two bank examiners does contain certain facts not hereinbefore noted and which were considered by the defendant commissioner and are summarized in the opinion of the circuit judge as follows:

"Also that he (the banking commissioner) took into consideration the number of small loan companies licensed by the State banking department and operating in the city of Detroit, of which there were 60. That he took into consideration the total number of credit unions, State and Federal, of which there were 57 State and 51 Federal, which latter are supervised by the Federal Deposit Insurance Corporation, and that he received his information from that source, and recited as to whom these companies serve and the manner in which it is done."

While the institutions just above noted, as is also true of building and loan associations, render a

certain and limited financial service, it canont be said that they function in the same field or render a service comparable to that of commercial banks.

Consideration of this record and the accompanying briefs leads to the conclusion that the divergent contention of plaintiffs on the one hand and defendant on the other are due not so much to a difference of opinion as to the material facts, as to their manner of approach to the subject in controversy. Plaintiffs' approach is primarily on the basis of there being only six commercial banking units in Detroit, but primarily defendant's approach is on the basis or assumption that there are in Detroit 105 banks, i.e., six parent commercial banks and 99 branches. Quite clearly neither premise is sound for all purposes. For example it is unfair to proceed on the assumption that there are only six banks in Detroit when considering what in fact are the present banking conveniences in this extensive and populous community. Likewise it is unfair and misleading to assume that there are 105 commercial banks in Detroit when considering diversity of banking policies, proper amount of bank capital, avoidance of monopolistic tendencies, et cetera. Fairness requires recognition of the actual existing conditions, i.e., that in Detroit there are only six groups or units in the field of commercial banking and that these six banking units have extended their service by establishing 99 branches. It would be quite absurd to say that the branch banks do not enter into the Detroit banking picture, and equally absurd to say that the present banking situation in Detroit is the same as though there were in that city 105 unrelated chartered banks.

Further recital of the details of the phase of the record bearing upon "necessity" would not be helpful. Our careful study and review of the testimony touching the issue of "necessity" brings the conclu-

sion that the defendant in deciding that there was no "necessity for the organization  *  *  *  of an additional bank" in Detroit was in error; but we are also convinced that this error was primarily due to a misconstruction by defendant of the pertinent statutory provisions. In our opinion the construction placed by defendant upon the statutory requisite of "necessity" was too restricted. In the circuit court he in part testified as follows:

"*Q.*  *  *  *  What definition of 'necessity' did you use in denying this charter?
"*A.* The absolute need.
"*Q.* Absolute need?
"*A.* That's right; the economic need, either way."

It would be quite futile to attempt an exact definition of "necessity" as that term is used in the numerous and varying statutory provisions of this State. The subject matter of each of such statutes must be given consideration in determining the legislative intent in making use of the word "necessity," or necessary, in a given legislative enactment. But in the instant case we must hold that it should not be construed to mean an "absolute need" or the "economic need," if these latter words are deemed to be synonymous of "absolute need" as evidently defendant concluded in passing upon plaintiffs' application. Defendant's concept of "necessity" is not only indicated by his testimony above quoted, but also by the fact that in conference with the plaintiffs' representatives prior to the receipt of their application and showing supporting it, defendant stated: "There was no necessity  *  *  *  for a new bank in Detroit," and by the further fact that since March, 1943, when defendant became banking commissioner, he has not chartered a new bank in Detroit.

While we are not definitely advised as to the exact number of branch banks in Detroit which in recent

years have been authorized, it is a fair inference
from the record that comparatively recent author-
ization of several such banks has been granted.
There is testimony that one such bank was about to
be opened within a few days after hearing in the
instant case, and that the establishment of six
branch banks was at that time contemplated. Such
authorization must have resulted from a determina-
tion that there was a necessity therefor. As shown
by defendant's testimony, the organization of branch
banks furnishes no new capital funds, and, in fact,.
such organizations result in capital expenditures.
Since the chartering of new banks results in provid-
ing additional banking capital in the community, in
the instant case at least $2,500,000, and also results
in greater diversity of competitive banking facili-
ties, it is difficult to conclude, if the growth of bank-
ing needs in a community has resulted in a "neces-
sity" for the organization of 99 branch banks by only
six parent banks, that there does not exist within
the statutory meaning a "necessity" for a newly-
chartered parent bank. An opposite conclusion
would result in a policy tending to an undesirable
monopolistic condition in the particular banking
field.

Under defendant's view, construing the statutory
word "necessity" as he does, it would seem that there
could not be a newly-chartered bank in Detroit so
long as the six existing parent banks and their pres-
ent or future branches meet the banking necessities
as at present. We think such a result is not con-
ducive to future healthy banking conditions in De-
troit; and that in concluding otherwise defendant
gave an erroneous meaning to the statutory pro-
vision as to "necessity." The extent to which de-
fendant relied upon this phase of the record is indi-
cated by his counsel's statement in the trial court
as follows: "That there is enough banking service

in the city of Detroit to take care of all the banking needs. * * * And if that is true, they are not entitled, under the statute, to a bank." If the banking commissioner concluded, as he testified, that plaintiffs' application should be denied because he was of the opinion the existing banking facilities "render complete banking service, both as to commercial service as well as industrial," we think such reason was not alone controlling. In the Minnesota statute governing chartering new banks, instead of using the word "necessity" the corresponding requirement is a "reasonable public demand." On certiorari to the supreme court from the commission's denial of an application for a certificate authorizing a new bank, the order was affirmed in view of the facts disclosed. But as pertinent to our present consideration, the Minnesota supreme court said:

"That the business of banking is so intimately connected with the general welfare of the public that it may be constitutionally regulated under the police power is not open to question. (Citing numerous decisions.) * * * It (the governing statute) does not intend that one or more established banks may keep out another because the banking facilities sufficiently take care of the banking business. Its purpose is not to deter competition or foster monopoly, but to guard the public and public interests against imprudent banking." *State, ex rel. Dybdal,* v. *State Securities Commission,* 145 Minn. 221 (176 N. W. 759).

We are in accord with the defendant's position that mere convenience is not sufficient to satisfy the statutory requisite of "necessity." But when supplemented by proof of facts and circumstances which, as in the instant case, are persuasive of "necessity," it is proper to take into consideration testimony as to the element of convenience. We have not found, nor has there been called to our attention by counsel,

a decision wherein there is a precise definition of "necessity" when used in a statute relative to the issuance of a bank charter. It is only fair to note herein, that in making determination in the instant case neither the banking commissioner nor the circuit judge had the guidance of judicial decision specifically in point. Decisions incident to like provisions in statutes pertaining to other fields of the law are not conclusive or particularly helpful as affording decisive precedent in construing the statutory provision under consideration, because, as stated in defendant's brief: "We believe that in determining the meaning of the term as employed in the statute under consideration (if any ambiguity exists), we must refer to the context and to the object and purposes sought to be accomplished." However, there has long been in the fundamental law of Michigan the provision that: "Private property shall not be taken * * * without the *necessity* therefor being first determined." Constitution 1908, art. 13, § 1. In deciding *In re Jeffries Homes Housing Project,* 306 Mich. 638, we held in substance that there was "necessity" for taking private property incident to a slum clearance and improvement of a housing situation, on the ground that it concerned public safety and morals—*i.e.,* that it concerned public welfare. Obviously such a case did not present an "absolute need." Conditions might have gone on as they were before the slum clearance. So, since the primary function of banking facilities involves the welfare and convenience of the portion of the public concerned, it would seem reasonably to follow that "necessity," as used in the controlling statute, was not intended by the legislature which enacted the law to mean absolute or indispensable need. Instead, we are of the opinion that the meaning or import of "necessity" as embodied in the statute is a substantial or obvious need justifying

the chartering of a new bank in view of the disclosed relevant circumstances. In so holding we are in accord with the writing of Chief Justice Marshall in *M'Culloch* v. *Maryland,* 4 Wheat. (17 U.S.) 316 (4 L. Ed. 579). Concerning the import of the word "necessary" as used in the Federal Constitution,* at page 413, he said:

"Is it true, that this (indispensable) is the sense in which the word 'necessary' is always used? Does it always import an absolute physical necessity, so strong, that one thing to which another may be termed necessary, cannot exist without that other? We think it does not. If reference be had to its use, in the common affairs of the world, or in approved authors, we find that it frequently imports no more than that one thing is convenient, or useful, or essential to another. * * * It is essential to just construction, that many words which import something excessive, should be understood in a more mitigated sense—in that sense which common usage justifies. The word 'necessary' is of this description. * * * This word, then, like others, is used in various senses; and, in its construction, the subject, the context, the intention of the person using them, are all to be taken into view."

In the light of the foregoing we are constrained to hold that plaintiffs did establish "necessity" for another bank in Detroit, and that as a matter of law defendant erred in his concept of the scope and meaning of "necessity" as used in the particular statute, which error primarily resulted in denial of plaintiffs' petition; and that the trial court was in error in affirming defendant's determination in that particular. In our opinion such result would follow

---

* United States Constitution, art. 1, § 8:

"The congress shall have power; * * *

"(18) To make all laws which shall be necessary and proper for carrying into execution the foregoing powers, and all other powers vested by this Constitution in the government of the United States, or in any department or officer thereof."

even under the construction placed upon the statutory word in defendant's brief, wherein it is said: "It is our contention that the term 'necessity' as used in the statute under consideration was intended to mean and include 'economic need.'"

There remains to be considered whether the record is such that defendant was or was not justified in refusing plaintiffs' petition for a new bank in Detroit on the ground, in part, that he was not "convinced of the likelihood of its successful operation if established."

Much of the factual aspect of the record hereinbefore reviewed bears upon this issue, as well as upon "necessity" and need not be repeated. While not controlling, we note that defendant in denying plaintiffs' petition did not say he was convinced or that he was of the opinion that if this bank were established it would *not* be successful. And when testifying in the circuit court defendant did not give lack of prospective successful operation, or at least only inferentially, as a reason for his denial of plaintiffs' petition. It was not considered in the lengthy opinion filed by the circuit judge. Nor is that reason at all stressed in defendant's brief in this Court. None of the six witnesses for defendant, each of whom is connected with a Detroit bank of which a new bank would be a competitor, testified that in his judgment the proposed new bank would not successfully operate. On the other hand, in behalf of plaintiffs there was competent opinion testimony that the proposed new bank would operate successfully. Mr. McLucas, who, as noted above, is chairman of the board of the National Bank of Detroit, gave as his opinion that the "banking future" in Detroit is "very excellent." As bearing upon successful operation of a new bank, he further testified:

"I think in Detroit it (banking business) is particularly on a sound basis, and a basis that under present conditions is profitable to the banks. The banks are all expanding in their facilities and quarters, spending vast amounts of money, in the last few years for this growth in business; and I think that they have excellent prospects of profitable— sound and profitable operations.  *  *  *

"Q. * * * Have you any question in your mind as to the ultimate success of an additional bank organized and managed by an adequate group in the city of Detroit?

"A. No, sir."

The above is not met in the record by any persuasive testimony. Further the record discloses that in about 1933, under conditions said to be much less favorable than are Detroit banking conditions at the present time, the Manufacturers National Bank was organized and located in the Penobscot building in the quarters which plaintiffs propose to occupy. That bank was eminently successful. In 1944 it moved to another location in Detroit and is now the second or third largest bank in that city. The Wabeek State Bank of Detroit, chartered in 1938, with a capital of $1,600,000, has experienced continuous prosperity. As of June 30, 1947, it had upwards of 50,000 commercial and savings accounts with total deposits in excess of $72,000,000. The undisputed testimony of a well informed witness, concerning the Wabeek Bank, is: "I would say there has been a steady growth right from the time the bank was chartered. We have four branches." In view of the foregoing and other phases of the record, to some of which reference has been made, in considering the issue of "necessity," we are of the opinion that denial of plaintiffs' petition under this record on the ground of lack of proof of the likelihood of successful

operation, would be unreasonable and contrary to the intent of the statute.

As to the authority for the character or scope of judicial review in the instant case (which on this appeal is a controverted matter) and the relief which may be decreed, we note the following:

"Any financial institution under this act, or officer or director thereof or any party of interest therein, being dissatisfied with any rule, regulation, order, demand, ruling or finding (hereinafter in this section referred to as an order) whatsoever, made by the commissioner, may commence an action in the circuit court in chancery * * * against the commissioner as defendant to vacate and set aside such order on the ground that the same is *unlawful or unreasonable.* * * * The said circuit courts in chancery are hereby given jurisdiction of such suits and empowered to affirm, modify, vacate, or set aside the order of the commissioner in whole or in part and *to make such other order or decree as the court shall decide to be proper and in accordance with the facts and law.* Any party shall have the right to appeal from such decree to the Supreme Court in the same manner as from other chancery suits." Act No. 341, § 21, Pub. Acts 1937 (Comp. Laws Supp. 1940, § 11897-21, Stat. Ann. 1943 Rev. § 23.739).

Clearly the foregoing statute authorizes a much broader judicial review than is provided in statutes which limit the review of orders or determinations of administrative agencies to certiorari direct from such agencies' orders or determinations to the Supreme Court. The controlling statute in the instant case provides for suit by original bill of complaint in the circuit court in chancery by an interested party who considers the banking commissioner's determination "unlawful or unreasonable;" and our review is of the decree entered in the circuit court "in the same manner as from other chancery suits,"

rather than a review of the order of an administrative agency.

This is not a rate case, nor does it involve review of a regulatory provision by a controlling administrative agency. Instead it involves only plaintiffs' right to engage in the banking business subject to conditions prescribed by the statute. Our review is of the denial of such right, which denial we conclude resulted from a misinterpretation of the applicable law. In such a case the right of judicial review exists. While in the instant case the banking commissioner was not acting in accord with any fixed rules or regulations of his department, he did act in accord with what he erroneously believed was the proper legal rule or guide. In that respect the instant case is within a like field of law as *Rock* v. *Carney,* 216 Mich. 280, wherein a headnote reads:

"While the power to protect the public health is vested by law in public health boards, the legality and reasonableness of the rules and regulations through which this power is exercised constitute judicial questions beyond the power of the legislature to foreclose."

As above noted, if an interested party deems the holding of the banking commissioner is "unlawful or unreasonable," the controlling statute provides a wide scope of review of orders or determinations of the character under consideration, incident to which the banking commissioner acts in a *quasi* judicial capacity. If, as we find in the instant case, an erroneous decision is the result of a mistaken interpretation of applicable law, the reviewing court is authorized "to make such other order or decree as the court shall decide to be proper and in accordance with the facts and the law."

The decree entered in the circuit court is reversed and a decree will be entered in this Court directing

defendant to grant plaintiffs' petition to organize the contemplated new bank in Detroit. No costs allowed.

Bushnell, C. J., and Sharpe, Boyles, Reid, Dethmers, Butzel, and Carr, JJ., concurred.