**STATE BANK OF COLOMA, a Michigan Banking Corporation, Plaintiff,**

v.

**James E. SMITH, as comptroller of the Currency of the U. S. of America and the First National Bank of Watervliet, a national banking association, Defendants.**

**No. K 75–331.**

United States District Court,
W. D. Michigan, S. D.

Nov. 11, 1975.

John D. Tully, Grand Rapids, Mich., for plaintiff.

John L. Crow, Benton Harbor, Mich., Gary L. Ryan, Washington, D. C., Frank S. Spies, U. S. Atty., Grand Rapids, Mich., for defendants.

## OPINION AND ODRER

MILES, District Judge.

This is an action filed under the Declaratory Judgment Act, 28 U.S.C. § 2201 challenging the administrative determination by the Comptroller of the Currency that defendant bank could operate a branch bank at a site described as the "intersection of Red Arrow Highway and Center Street" in Coloma Township, Berrien County, Michigan. The case is currently before this Court on plaintiff's request for injunctive relief and defendant's motion for summary judgment. The complaint filed on July 24, 1975 sought a declaratory judgment to the effect that the Comptroller's action violated provisions of the National Bank Act (McFadden Act), more specifically, 12 U.S.C. § 36, along with injunctive relief enjoining the defendants from opening the proposed branch bank. The matter came before the Court on plaintiff's petition for a temporary restraining order on July 25, 1975. On that date, a temporary restraining order, along with an Opinion on Petition for Temporary Restraining Order was issued. The order prohibited defendants "from undertaking any overt physical act upon the site," set a date for hearing on a preliminary injunction and allowed defendant to continue its "present contractual relationships looking toward the potential construction" of the branch.[1] The defendant bank thereafter answered the complaint, and later filed a motion to dissolve the temporary restraining order. A hearing was held on this motion on August 18, 1975, and it was denied by an Opinion filed August 22, 1975. This denial was due in large measure to the Court's conclusion that in light of the potential for irreparable harm to the plaintiff bank's business, the status quo should be preserved pending receipt of the administrative record, which at that time was still being prepared by the Comptroller. The Court finally did receive the Administrative record on September 30, 1975. Defendant bank next challenged this ruling by way of an application for a writ of mandamus.[2] During this same

---

1. A more complete presentation of the motivations underlying the provisions of this order is found in the Court's Opinion on Motion to Dissolve TRO dated August 22, 1975, and in the Response to Writ of Mandamus dated September 10, 1975.

2. This writ was decided by the Court of Appeals on November 3, 1975 and received in this office on November 5, 1975. It concludes: "IT IS ORDERED that the application for writ of mandamus be and it is hereby denied."

period the defendants moved for summary judgment and both parties submitted briefing on this motion, and on plaintiff bank's request for injunctive relief. Oral argument on these motions was heard on October 6, 1975 and at that time, the Court, from the bench, orally modified the order then in force to allow the defendant bank to undertake at its peril the construction of the branch and all the preparations necessary to the operation of the branch, short of its actual opening.

## COMPTROLLER'S ADMINIS-TRATIVE RECORD

The administrative record made by the Comptroller sets forth the factual setting giving rise to this case. On July 2, 1974, defendant bank filed an application with the Comptroller for permission to establish a branch at the above mentioned location. The application was forwarded to the Comptroller's Washington office, but because of a failure to comply with the notice requirements of the Comptroller's regulations (5 C.F.R. § 5.2(b)), this application received no consideration by the Comptroller. A reapplication was filed on August 2, 1974, and its processing was commenced by the Comptroller. This included the submission of a summary of information, the publication of notice of the application, the notification of other banks which might have an interest in the application and a field investigation by a national bank examiner. Upon receipt of the notice of defendant bank's application, plaintiff bank registered its objections and requested, first, an interview, and later a public hearing, pursuant to 12 C.F.R. § 5.4. This latter request was approved by the Regional Administrator on August 26, 1974 and the hearing was scheduled for December 19, 1974 in Chicago, Illinois. The scheduled hearing was held and the parties were afforded the opportunity to present exhibits, witnesses and arguments. In addition, the Deputy Regional Administrator agreed to hold the public file open for a ten day period following receipt of the transcript. Plaintiff bank made use of this opportunity to file post-hearing briefing on the legal issues involved. After review of this record by the staff of the Regional Administrator and of the Comptroller, the branch bank application was approved by the Acting Comptroller of the Currency on June 23, 1975. The decision prompted the filing of this case.

## STANDARD OF REVIEW BY DISTRICT COURT

Before turning to a direct review of the merits of this case, we must first, with some specificity, ascertain the standard of review which must guide our deliberations. We are afforded pivotal assistance in this task by the Supreme Court's opinion in *Camp v. Pitts*, 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973). There, in a case involving the denial by the Comptroller of an authorization to charter a bank, the Court, speaking per curiam stated:

> Unquestionably, the Comptroller's action is subject to judicial review under the Administrative Procedure Act (APA), 5 U.S.C. § 701. See *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 156–158, 90 S.Ct. 827, 831–832, 25 L.Ed.2d 184 (1970). But it is also clear that neither the National Bank Act nor the APA requires the Comptroller to hold a hearing or to make formal findings on the hearing record when passing on applications for new banking authorities. See 12 U.S.C. § 26; 5 U.S.C. § 557. [Footnote omitted.]

\*     \*     \*     \*     \*     \*

Nor was the reviewing court free to hold a *de novo* hearing under § 706 (2)(F) and thereafter determine

whether the agency action was "unwarranted by the facts."

\* \* \* \* \* \*

The appropriate standard for review was, accordingly, whether the Comptroller's adjudication was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," as specified in 5 U.S.C. § 706(2)(A). In applying that standard, the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court.

\* \* \* \* \* \*

If, as the Court of Appeals held and as the Comptroller does not now contest, there was such failure to explain administrative action as to frustrate effective judicial review, the remedy was not to hold a *de novo* hearing but, as contemplated by *Overton Park,* to obtain from the agency, either through affidavits or testimony, such additional explanation of the reasons for the agency decision as may prove necessary. We add a caveat, however. Unlike *Overton Park,* in the present case there was contemporaneous explanation of the agency decision. The explanation may have been curt, but it surely indicated the determinative reason for the final action taken: the finding that a new bank was an uneconomic venture in light of the banking needs and the banking services already available in the surrounding community. The validity of the Comptroller's action must, therefore, stand or fall on the propriety of that finding, judged, of course, by the appropriate standard of review. If that finding is not sustainable on the administrative record made, then the Comptroller's decision must be vacated and the matter remanded to him for further consideration. 411 U.S. 140–143, 93 S.Ct. 1243–1244.

█ The test under this standard has been construed to involve an inquiry into whether the challenged agency action stands upon a rational or reasonable basis and whether the decision shows consideration of the relevant factors. *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *Chrysler Corp. v. Department of Transportation,* 472 F.2d 659 (6th Cir. 1972); *Air Transport Association of America v. Federal Energy Office,* 382 F.Supp. 437 (D.C.1974). Something more than mere error appears to be required, *N.L.R.B. v. Parkhurst Mfg. Co.,* 317 F.Supp. 513, 518 (8th Cir. 1963); *First National Bank of Fayetteville v. Smith,* 508 F.2d 1371 (8th Cir. 1974). There must be a clear error of judgment, *Overton Park,* supra; *Chrysler Corp. v. Department of Transporation,* supra. In this type of review:

"The fact that on the same evidence a reviewing court could have reached a decision contrary to that reached by the agency will not support a determination that the administrative action was arbitrary and capricious." *N.L.R.B. v. Jas. H. Matthews & Co., Industrial Mark. Prod. Div.,* 342 F.2d 129, 131 (3 Cir. 1965), cert. denied, 382 U.S. 832, 86 S.Ct. 74, 15 L.Ed.2d 76 (1965).

(Quoted in *Carlisle Paper Box Co. v. N.L.R.B.,* 398 F.2d 1 (3rd Cir. 1968).

## CRITERIA CONSIDERED BY COMPTROLLER

The conditions under which the Comptroller may approve an application by a national bank for a new branch are contained in Section 7 of the McFadden Act, appearing now, as amended in 12 U.S.C. § 36. Subsection (c) of that section provides in pertinent part:

"A national banking association may, with the approval of the Comptroller of the Currency, establish and operate new branches: (1) Within the limits of the city, town or village in which said association is situated,

if such establishment and operation are at the time expressly authorized to State banks by the law of the State in question; and (2) at any point within the State in which said association is situated, if such establishment and operation are at the time authorized to State banks by the statute law of the State in question by language specifically granting such authority affirmatively and not merely by implication or recognition, and subject to the restrictions as to location imposed by the law of the State on State banks   .  .  . "

The applicable state statute here is M.C.L.A. § 487.471, M.S.A. § 23.710 (171), and it reads in pertinent part:

With the written approval of the commissioner, any bank may establish and operate a branch or branches within a village or city other than that in which it was originally chartered if the village or city in which it is proposed to establish and operate a branch is located in the same county in which the parent bank has its principal office or, if not in the county, then within 25 miles of the parent bank or in a contiguous county at a point more than 25 miles from the parent bank, if the county has no bank. A branch shall not be established in a city or village in which a state or national bank or branch thereof is then in operation  .  .  . "

"(2) With the written approval of the commissioner, any bank may establish and operate a branch or branches within the limits of the city or village in which the bank is located if the commissioner is satisfied as to the necessity for the establishment of the branch or branches and the prospects of successful operation if established."

With respect to the meaning of the term "village" in this context, the Michigan courts have broadened the term considerably beyond its commonly used legal definition.

"The word 'village' is not a technical word, or one having a peculiar meaning, but it is a common word in general usage with an ancient lineage. It is merely an assemblage 'or community of people, a nucleus or cluster for residential and business purposes, a collective body of inhabitants, gathered together in one group." *Wyandotte Savings Bank v. State Banking Commissioner,* supra, 347 Mich. 33 at 41, 78 N.W.2d 612 at 617.

"It is a settlement a centralized populous area having a general common residential and business activity serving the particular area or district * * *. It has been analyzed as a 'trading area' distinct from that assigned to 'municipality'." *Bank of Dearborn v. State Banking Commissioner,* 365 Mich. 567, 571, 114 N.W. 2d 210, 212 (1962)

The cases point out that an area's status as a banking village is not affected by its lack of formal boundaries or legal corporations, and that economic factors are to be given decisive weight.[3]

On the definition of "necessity," the Michigan law holds that absolute necessity is not the requisite, rather a "substantial or obvious need" is sufficient. *Moran v. Nelson,* 322 Mich. 230, 244–245, 33 N.W.2d 772 (1948). Plaintiff contends that on the facts obtaining here, the Comptroller cannot properly find defendant bank's application sufficient under either of these standards. Defendants counter with the assertions that the Comptroller's decision is sufficient under the standard

---

**3.** Although these cases dealt with the earlier version of this provision M.C.L.A. § 487.34, M.S.A. 23.762, comparison of the two statutes shows them to be substantially similar.

The analysis developed thereunder thus remains applicable to the newer version of the law involved herein.

of review governing this case and that this Court is not justified in overturning it.

█ Our review is limited, as it must be, to the administrative record of the Comptroller, supplemented by the thorough arguments, briefing and summaries of counsel. Our task is to ascertain whether the Comptroller took cognizance of the relevant criteria in his decision, and whether there is a rational basis upon which this decision can stand. The Court has scrutinized the administrative record in some detail and has become convinced that the Comptroller's action here is indeed founded on an adequate and rational foundation. The basis for the challenged administrative action can be discerned from a number of points in the administrative record.[4] In addition to officers of the defendant bank who testified at the December 19, 1974 hearing on its application for the branch, Mr. Lavern Rice, an area realtor and a director of the bank, testified as to the growth of the area and its projected future (Transcript 25–28). More important is the testimony of Mr. Brandon M. Rogers, a professional community planner who studied the area is some depth. He testified at length concerning the growth patterns of the region, the description and identity of the banking village proposed in defendant bank's application, concluding that a separate and distinct community is indeed emerging between the cities of Coloma and Watervliet (Transcript 29–50). The National Bank Examiner, in his report on this application, concluded in part as follows:

"Applicant bank is well managed and progressive. As such, it is capable of providing adequate and convenient service to its customers in the Coloma area. The Head Office is lacking in parking and at peak periods, the lobby is overcrowed. The area along the Red Arrow Highway from Watervliet to the city limits of Coloma is developing with a large mobile home park just outside of Watervliet in its final stages of completion, and a new multiple-housing development under way about a quarter of a mile to the west. There is ample land available for commercial and residential development and it is likely that the location of a branch will accelerate the rate of growth. Chances of a successful operation are favorable . . .

Parking facilities at the bank's Head Office are extremely limited and there is a need for more lobby space from which to serve the bank's customers. It is not economically feasible for the bank to acquire additional downtown real estate with which to expand its existing quarters nor is there adequate space with which to provide additional parking, therefore, it is necessary to seek another solution to the problem. The logical location for a branch seems to be along the Red Arrow Highway somewhere between Watervliet and Coloma. Since it is now apparent that commercial and residential growth is occurring along this strip and since it appears likely that this growth will continue, chances of a successful operation are virtually assured and the Examiner respectfully recommends that the application of the First Na-

4. As mentioned previously, this record was not presented to the Court until September 30, 1975. Further, certain documents, specifically certain inter-office memoranda of the Comptroller pertaining to the applicant bank's condition were omitted from the record, based on a claim by the Comptroller that they are confidential and privileged. (See Certifi-

cate of Comptroller, first page of Administrative Record). This problem has had to be confronted in many of the cases cited in this opinion. Here however, we do not feel we need to meet the issue. It was raised by none of the parties, and the information withheld does not appear to the Court to have relevance to any of the issues advanced herein.

tional Bank of Watervliet to establish a branch at the intersection of Red Arrow Highway and Center Street, Coloma Township, be approved. (Admin.Record P 018)

The Deputy Regional Administrator of the Comptroller's Office also recommended approval of the application, stating in part:

"This application represents the efforts of the First National Bank of Watervliet to better service its existing customers by establishing a branch on the outskirts of two-mile distant Coloma, Michigan. The two towns, located on the southern shore of PawPaw Lake, have historically been dependent upon the local agricultural community and resort area for their financial well-being; however, the escalating deterioration of the Benton Harbor-St. Joseph urban area has made the subject towns extremely desirable for commuting workers. The consequent population increase has caused strip development of the unincorporated area between the towns, both along the lake shore and along the Red Arrow Highway. The proposed branch would be located along this latter-named thoroughfare. Area competition is provided by the Head Office of the State Bank of Coloma, a $12 million deposit institution located in downtown Coloma, 7 miles west of the proposed branch, and a similarly-sited branch of the LaSalle Federal Savings & Loan Association with an estimated $5 million in share accounts. The ability of the applicant to compete against these Coloma-domiciled institutions is evidenced by the sizeable loans and deposits it already generates from the service area. In addition to more conveniently serving these existing accounts, the First National Bank of Watervliet would undoubtedly be capable of additional penetration to ensure successful operations.

Fixed asset investment is deemed modest and annual occupancy expense is not believed burdensome.

\* \* \* \* \* \*

In conclusion, I believe the proposal is in the best interests of bank and public. The applicant suffers from no known asset, management or capital problems which might be deemed as factors against the establishment of this branch. Subject to the determination of legality, I recommend approval.

This application has been discussed fully with Regional Administrator Hall and he concurs with my conclusion." (Admin.Record PP 019–020)

In light of these statements, the Court does not conclude that review of the Comptroller has been frustrated by the absence of formal findings, as did the First Circuit in *First Bank and Trust Co. v. Smith*, 509 F.2d 663 (1st Cir. 1975). As stated by that Court at p. 666:

[T]he point is not whether there is support in the record for the Comptroller's decision—we believe there would be, assuming he applied the correct legal standard. The point is whether or not the Comptroller reviewed the facts in light of the Massachusetts statute law. Under 12 U.S.C. § 36(c)(2), the Comptroller had a duty to focus on the controlling state statute; and the contesting banks were entitled to have the application measured against this legal standard. Otherwise their arguments in opposition were an exercise in futility from the start.

We do not hold the Comptroller to any particular form of record; a conclusory statement or even a subordinate's report directed to the relevant standard might have satisfied us that the appropriate legal standard had been recognized and applied. But here there is not only an absence of affirmative recognition of Massachusetts law, there are indications on the face of the

record that those with the responsibility for guiding the Comptroller may not have considered it at all. We think the present record to be so deficient as to "frustrate effective judicial review." *Camp v. Pitts, supra*, 411 U.S. at 142–143, 93 S.Ct. 1241, 36 L.Ed.2d 106.

Nor is this case like that of *American Bank & Trust Co. v. Saxon*, 373 F.2d 283 (6th Cir. 1967), wherein the Court, in the process of finding the Comptroller's action an abuse, stated at p. 289:

It should be emphasized that defendants produced no witness who said that there was a separate trading area beginning on the west side of Aurelius Road; no witness, even by opinion evidence, supported the claim of a separate village. The most informed of defendant's witnesses, the township's supervisor, said directly that the east and west sides of Aurelius Road were in the same village.

The concept of frustration of review was well stated in *Village Bank v. Smith*, 388 F.Supp. 1253 (W.D.Okl.1975):

In a case like the present one, where the Comptroller has made no formal findings and a de novo review is inappropriate, the reviewing court is left with three alternatives.

First, if the lack of formal findings frustrates effective judicial review, the Court must remand the case to the Comptroller for formal findings. Judicial review is frustrated if the Court cannot determine the factors which formed the basis for the decision.

That is not the case here. Not only do we have the evidence (statements) excerpted above, but there is also in this record the type or character of

statement which the First Circuit would have found to have been sufficient in the *First Bank & Trust Co.* case.[5] At page 019 of the Administrative Record, the Deputy Regional Administrator stated:

"While ultimate determination of the legality of the proposal is deferred to your office, it would appear that the amply proportioned banking village contains sufficient economic activity to justify the legal establishment of the branch under Michigan law."

■ Moreover, the Comptroller's handling of this application does not evidence the blatant administrative action which characterized the administrative processing of the branch bank applications reviewed in *American Bank & Trust v. Saxon, supra* or in *Bank of Dearborn v. Saxon*, 244 F.Supp. 394 (E. D.Mich.1965). In *American Bank & Trust*, the Comptroller, after disapproving an application for a branch bank in a village where the bank already had a branch, suggested that by moving the site of the bank some 660 feet across a highway, a finding that a separate banking village existed could be made. When this was done, the District Court approved, and the Court of Appeals reversed. In *Bank of Dearborn*, the Court ruled that the Comptroller abused his discretion in allowing a bank to evade the applicable Michigan law by approving the closing of an existing branch in a city followed by the opening of a new branch a short distance away across a city line, and then the opening of another branch back inside the city in a new shopping center. Here, in contrast, there is every appearance that the instant application was treated in routine and legal fashion by the Comptroller. There is no indication whatsoever that

5. With respect to the criteria the Comptroller must follow, it should be noted that although decisions of the Michigan Financial Institutions Bureau dealing with the nature of a banking village in Michigan have been cited to this Court, and presumably at an earlier time to the Comptroller, these state agency interpretations of state law are not binding upon the Comptroller. *First Bank & Trust Co. v. Smith*, 509 F.2d 663, 666 n. 2 (1st Cir. 1975).

the applicant bank and the Comptroller attempted to sidestep the statutory requirements.

The late Hon. W. Wallace Kent, while sitting on this Court, summarized this Court's attitude when, while ruling on a propriety of a branch bank application in *Southern Michigan National Bank of Coldwater v. Saxon* (W.D.Mich. Civil Action 4948, 1965), he stated:

"If the Court were deciding whether this was a village, it would decide that this was not a village. It is not incumbent upon this Court to decide that this is or is not a village. Our determination must be as to whether the action of the Comptroller was arbitrary, capricious or in violation of law. And while it is, in this Court's opinion, a close issue, we are not in a position to hold that this area is not a village to the extent that we can claim that the Comptroller acted in violation of law." (Quoted in *National Lumberman's Bank & Trust Co. v. Camp* (W.D.Mich. Civil Action 6179), Transcript p. 3 (Defendant Comptroller's Brief, App "B" p. 3)

Accordingly, for the reasons set forth above, it is ordered and adjudged that Defendant's Motion for Summary Judgment be and the same is hereby granted; and that Plaintiff's Complaint and Request for Injunctive Relief and this action be and the same are hereby dismissed with prejudice.

It is further ordered that the effect of this Judgment shall be delayed until 15 days after the date hereof for the purpose of allowing plaintiff to seek and obtain, if they so desire, and if such court shall so hold, a restraining order from the Court of Appeals pending appeal of this action.