**INDUSTRIAL STATE BANK AND TRUST COMPANY, a Michigan banking corporation, Plaintiff,**

v.

**William B. CAMP, Comptroller of the Currency of the United States, and the First National Bank and Trust Company of Kalamazoo, a national banking association, Defendants.**

**Civ. A. No. 5687.**

United States District Court
W. D. Michigan, S. D.
June 10, 1968.

---

Emery, Parsons, Bahr, Tennent & Hogan, Detroit, Mich., for plaintiff; William H. Merrill, Detroit, Mich., of counsel.

Harold D. Beaton, U. S. Atty., Grand Rapids, Mich., Harland F. Leathers and John E. Shockey, Dept. of Justice, Washington, D. C., for defendant Camp.

Howard & Howard, Kalamazoo, Mich., for defendant First National Bank; Frederick A. Lake, Kalamazoo, Mich., of counsel.

## OPINION

FOX, District Judge.

Plaintiff, Industrial State Bank and Trust Company (hereinafter referred to as Industrial State), brings this suit to review the decision of the Comptroller of the Currency granting defendant's, First National Bank and Trust Company of Kalamazoo (hereinafter referred to as First National), application for a certificate for a branch bank at 3450 Sprinkle Road, Kalamazoo, Michigan.

Plaintiff contends that the Comptroller's action was arbitrary, capricious, and an abuse of discretion, in that he failed to find necessity as required by Section 34 of the Michigan Financial Institutions Act (M.S.A. § 23.762).[1] Defendants assert that they are entitled to a judgment as a matter of law on the grounds that the Comptroller's action was consonant with the law and not arbitrary, capricious, or an abuse of discretion.

In Bank of Dearborn v. Saxon, 244 F.Supp. 394 (E.D.Mich., 1965), aff'd 377 F.2d 496 (C.A. 6, 1967), after an evaluation of the pertinent provisions of the National Banking Act,[2] the Michigan Financial Institutions Act, and a review of the history of the National Banking Act, Judge Talbott Smith concluded: "It will be observed in the above statutory enactment [12 U.S.C. § 36(c)] that the law of the state involved is to be determinative as to the problem of branching. National Banks were given the same opportunity for branching as state banks,

---

1. Section 34, Michigan Financial Institutions Act (C.L.1948, Sec. 487.34 [M.S.A. § 23.762]), provides in part:
 "Any bank may, with the written approval of the commission, establish and operate a branch or branches within the limits of the city or village in which said bank is located: Provided, That the commission is satisfied as to the necessity for the establishment of such branch and the prospects of successful operation if established. No branch of any such bank shall be moved from 1 location to another within the same city or village without the written approval of the commission."

2. 12 U.S.C. § 36(c) provides in part:
 "(c) A national banking association may, with the approval of the Comptroller of the Currency, establish and operate new branches: (1) Within the limits of the city, town or village in which said association is situated, if such establishment and operation are at the time expressly authorized to State banks by the law of the State in question; and (2) at any point within the State in which said association is situated, if such establishment and operation are at the time authorized to State banks by the statute law of the State in question by language specifically granting such authority affirmatively and not merely by implication or recognition, and subject *to the restrictions as to location imposed by the law of the State on State banks.* * * *

 [N]o such association shall establish a branch outside of the city, town, or village in which it is situated unless it has a combined capital stock and surplus equal to the combined amount of capital stock and surplus, if any, required by the law of the State in which such association is situated for the establishment of such branches by State banks, or, if the law of such State requires only a minimum capital stock for the establishment of such branches by State banks, unless such association has not less than an equal amount of capital stock." (Emphasis supplied.)

thus perpetuating the dual banking system." 244 F.Supp. at 401.

■ In First National Bank of Logan, Utah v. Walker Bank & Trust Co., 385 U.S. 252, 87 S.Ct. 492, 17 L.Ed.2d 343 (1966), the United States Supreme Court held that state laws governing branch banking are absorbed by 12 U.S.C. § 36 (c) and binding on the Comptroller.

The Court said:

"It appears clear from this résumé of the legislative history of § 36(c) (1) and (2) that Congress intended to place national and state banks on a basis of 'competitive equality' insofar as branch banking was concerned. Both sponsors of the applicable banking Acts, Representative McFadden and Senator Glass, so characterized the legislation. It is not for us to so construe the Acts as to frustrate this clear-cut purpose so forcefully expressed by both friend and foe of the legislation at the time of its adoption. To us it appears beyond question that the Congress was continuing its policy of equalization first adopted in the National Bank Act of 1864." 385 U.S. at 261, 87 S.Ct. at 497.

■ Thus, "competitive equality" means *an equal opportunity for state or national banks to compete within the provisions of state laws controlling branch banking.* A national bank may branch either as an inside or outside branch providing it conforms with the requirements of state law.

■ In the instant case, the Comptroller contends that the provision of the Michigan Financial Institutions Act requiring the state banking commission to be satisfied as to necessity for the establishment of a branch and the prospects of its successful operation are not binding upon him.

This argument is answered by Justice Clark in the Walker case, supra, when he said:

"The Comptroller argues that Utah's statute 'expressly authorizes' state banks to have branches in their home municipalities. He maintains that the restriction, in the subsequent paragraph of the statute limiting branching solely to the taking over of an existing bank, is not applicable to national banks. *It is a strange argument that permits one to pick and choose what portion of the law binds him. Indeed, it would fly in the face of the legislative history not to hold that national branch banking is limited to those States the laws of which permit it, and even there 'only to the extent that the State laws permit branch banking.'* Utah clearly permits it 'only to the extent' that the proposed branch takes over an existing bank.

"The Comptroller also contends that the Act supersedes state law only as to 'whether' and 'where' branches may be located and not the 'method' by which this is effected. We believe that where a State allows branching only by taking over an existing bank, it expresses as much 'whether' and 'where' a branch may be located as does a prohibition or a limitation to the home office municipality. *As to the restriction being a 'method,' we have concluded that since it is part and parcel of Utah's policy, it was absorbed by the provisions of § 36(c) (1) and (2), regardless of the tag placed upon it."* 385 U.S. 261–262, 87 S.Ct. 497. (Emphasis supplied.)

Defendants argue that in Walker the Supreme Court was faced with an express statutory provision of Utah law, whereas under Michigan law the state banking commissioner makes a purely subjective determination as to the need or necessity of a particular branch bank. In support of their position, defendants cite Leuthold v. Camp, 273 F.Supp. 695 (D.Mont., 1967; appeal pending) in which the court rejected the state banking commissioner's argument that the Comptroller must abide by state administrative regulations.

Administrative regulations are not the equivalent of statutory laws. M.S.A. § 23.762 expressly states that the state banking commissioner must be satisfied that there is necessity for the establishment of a branch before granting approval.

■ The Supreme Court in Walker stated explicitly that it believed the purpose of the National Banking Act was " * * * to place national and state banks on a basis of 'competitive equality' insofar as branch banking was concerned." 385 U.S. at 261, 87 S.Ct. at 497. If state banks must establish necessity before being permitted to branch in Michigan, national banks should also be required to meet the same test, if as between national and state banks competitive equality is to be achieved.

In American Bank & Trust Co. v. Saxon, 373 F.2d 283 (C.A. 6, 1967), the Sixth Circuit Court of Appeals indicated that it believed the Walker decision supports the conclusion that Michigan's restriction as to necessity is binding on the Comptroller.

■ The Comptroller did not expressly make a finding on necessity in approving defendant First National's application for a branch bank. We recognize that such a finding could be implicit in his decision and that if there is substantial evidence to support such a finding his action must be affirmed. American Bank & Trust Co. v. Saxon, 248 F.Supp. 324, 332 (W.D.Mich., 1965), rev'd on other grounds 373 F.2d 283 (C.A. 6, 1967).

Assuming that the Comptroller found necessity without expressly stating it, we must now consider whether the evidence establishes necessity as defined by the Michigan Supreme Court in Moran v. State Banking Commissioner, 322 Mich 230, 33 N.W.2d 772 (1948).

In the instant case, the facts stand as follows: Defendant, First National, proposes to establish a branch bank at 3450 Sprinkle Road, a few hundred feet south of plaintiff's Sprinkle Road branch, and eight-tenths of a mile from a branch of American National Bank & Trust Company. First National presently has two other branches, Lovers Lane and Lake Center, approximately 2.00 and 4.70 miles from its proposed branch. (Admin. File p. 9.)

In 1963, plaintiff was granted permission by the Michigan State Banking Commission to open a branch office on the west side of Sprinkle Road, approximately one thousand feet north of the intersection of Sprinkle and Kilgore Roads in the City of Kalamazoo, at 4220 Sprinkle Road. (Admin. File p. 31.) This branch was closed on June 15, 1967.

On December 1, 1966 defendant bank was granted permission by the Comptroller of the Currency to operate a new branch on the southeast corner of the intersection of Sprinkle and Kilgore Road in Pavillion Township, Kalamazoo County, as an outside branch within what defendant claimed to be a village. The branch was opened on December 2, 1966. (Admin. File p. 31.)

On December 14, 1966, plaintiff instituted an action in this District, Industrial State Bank and Trust Company v. William B. Camp, Comptroller of the Currency of the United States, and First National Bank and Trust Company of Kalamazoo (W.D.Mich. Civil Action No. 5505), to enjoin the Comptroller from continuing a Certificate of Authority allowing defendant First National to operate a branch office at the intersection of Sprinkle and Kilgore Roads, because the Comptroller was arbitrary, unreasonable, and capricious in finding a village.

Plaintiff was previously denied an application for a branch at the same location by the Michigan Banking Commissioner, precisely because no village existed. The non-existence of a village was patently obvious.

By letter of February 27, 1967, First National filed an application with the Comptroller of the Currency, for permission to relocate the Sprinkle-Kilgore branch to 3450 Sprinkle Road, in the City of Kalamazoo, approximately a half mile north from the Sprinkle-Kilgore branch, and practically next door to Industrial State's branch at 3500 Sprinkle Road, Kalamazoo, a branch established by authority of the State Banking Commissioner on March 1, 1967, and opened on March 13, 1967.

On March 9, 1967, First National substituted a new application for its re-

location application, and requested a new branch to be located at 3450 Sprinkle Road, and permission to close its Sprinkle-Kilgore branch. (Admin. File pp. 66–68.)

On March 17, 1967, plaintiffs sent a letter of protest to defendant Comptroller in opposition to First National's branching at 3450 Sprinkle Road. (Admin. File pp. 44, 50.)

On April 3, 1967, this court found no village existed within First National's proposed service area, and that its application for a branch predicated upon the existence of a village was frivolous and clearly and palpably without merit, so as to require no argument to convince the court. (Admin. File p. 25.) A permanent injunction restraining First National from establishing a branch at the corner of Sprinkle and Kilgore Roads was issued on the same day. (Admin. File p. 26.)

First National's proposed branch would be in the extreme northeast corner of its suggested service area; as such it would be in close proximity to Industrial State's branch at 3500 Sprinkle Road. These facts indicate that First National was principally concerned with a location near the General Motors Fisher Body Plant's gate rather than realistically meeting the banking needs of the whole of its purported service area.

Applicant contends, and National Bank Examiner Arthur K. Veldey assumed, that the proposed branch is not intended to relieve conditions at any other office or serve as an adjunct to any other office. (Admin. File p. 31.) However, First National admitted in its application that it has $1,654,350 in deposits and $2,763,696 in loans from people and businesses located within the area it designates as a service area. (Admin. File p. 20.) Moreover, at Page 36 of the Administrative File, the following observations by Examiner Arthur K. Veldey appear in his "Report of Investigation of a Branch Application Filed by First National Bank and Trust Company of Kalamazoo, Kalamazoo, Michigan:

"The applicant bank provides a great number of banking services which are sold in the areas where people live and work and consequently offices are needed in these areas where this service can be offered conveniently to the public. At the present time the applicant has determined it has a considerable volume of business in this area *which can be more effectively and conveniently served and the applicant will be in a position to share in the new banking business which will develop in this rapidly expanding industrial area. Also, the applicant feels it is absolutely necessary to follow their present customers to the suburban areas of their home office city as these areas develop.*" (Emphasis supplied.)

This report also indicates that the purported primary service area has 82 commercial and industrial businesses, employing 4,568 people. Among the largest of the employers with businesses listed in the report are Fisher Body Division of General Motors, Brunswick Corporation, Fabri-Kal Corporation, Aeromotive Manufacturing Company, Precast Schakbeton, Inc., Doubleday Brothers, Inc., and Kalamazoo Road Commission. 40 of the 82 businesses are retail establishments, with 342 employees. (Admin. File pp. 33, 34.)

We again, as in 1967 in the matter of First National's Sprinkle-Kilgore branch, conducted an autoptic survey of the primary service area. Large and medium sized farms dominate most of the proposed service area with the exception of its northeast corner.

There is little residential development, as most of the homes are located in disconnected clusters. Long Lake, a residential community of 350 year around homes in the southwest corner of the primary service area, and the area's largest concentration of homes, is now being adequately served by First National's Lake Center branch. Indeed, First National's own expert, Dr. Douglas V. Austin, concluded that Long Lake falls within the primary service area of the Lake Center branch.

Retail outlets are scattered and largely industrially oriented. There are no shopping or trading centers where housewives, as is the common practice today, conduct their domestic shopping and banking. The trading area in Long Lake is Elmer's Store, which is approximately five miles from First National's proposed branch. This distance suggests that rather than use Sprinkle Road, an arterial highway running north and south along the western edge of First National's purported service area, to commute to the proposed branch, Long Lake residents would, as has been their custom, utilize the Lake Center branch.[3]

Defendant First National stresses the growth of the area as an industrial complex as an important reason for concluding that there is a need for its branch. In this respect its proposed branch is

across from the General Motors plant which presently has over 2,000 workers. The General Motors plant is not like a factory in a major city where large numbers of employees commute to and from work in busses or streetcars. Most, if not all, of the General Motors employees drive to work. Consequently, they are unlikely to congregate outside the plant at the end of a work day, or require the services of two branch banks. Whatever drive-in banking might occur can be and is adequately accommodated by plaintiff's branch.

Joseph G. Lutz, Regional Comptroller of the Currency, stated:

"I do not attach a significant degree of importance to the protest lodged by the Industrial State Bank, more in particular when it is noted that they are represented with two branches near

---

3. In our opinion of April 3, 1967 in Industrial State Bank and Trust Company v. William B. Camp, Comptroller of the Currency of the United States, and The First National Bank and Trust Company of Kalamazoo (W.D.Mich.Civil Action No. 5505), we observed:

"Plaintiff's witnesses testified to unconnected clusters of residences, both within and without the village. The unconnected cluster of residences were more without than within the village, and the only cluster of residences of any substance is that which surrounds the Long Lake area. I described that yesterday insofar as my view of the premises was concerned.

"It is abundantly clear that there is no strict residential area of any substance from Q Avenue north to proposed branch. It is abundantly clear that the Long Lake area, separated by some three and a half miles to the nearest approach of any substantial residential area in the Long Lake area, is an intervening area which is substantially agricultural and rural. I counted, I believe it was, 104 or 114 residences outside of the Long Lake area. If you subtract fifteen from that total, fifteen which are along 26th Street, north from 26th and Q Avenue, the number is even less. And it clearly emphasizes the character of a substantial area which is claimed to be a village.

"And it is abundantly clear that the Long Lake area which is a mile and

a quarter from defendant bank's City of Portage branch, indicated as Number 1 on Comptroller defendant's Exhibit 1T, is a service area which includes Long Lake. The Long Lake area is more immediately approximate and related to the City of Portage branch, Number 1 on Comptroller defendant's Exhibit 1T, than it is to the proposed branch which is certified in the claimed village.

"There is no arterial highway running north and south within the village. Sprinkle Road, as I previously described it, only touches at an intersection. There may be little extensions beyond the intersection, but after examining both ends of the northwest and southwest portion of the alleged village, I doubt it. Sprinkle Road is an arterial highway, insofar as the area involved in this case is concerned, which is wholly within the City of Portage.

"This is a leapfrog approach to connect up the branch which is not located near any retail outlet within the village. There are no churches, no professional buildings, no barber shops, beauty shops; none of the indicia of a community trading center within the boundary of a village. The only one is Elmer's Store, and that's the only one, which is four and a half miles south of the site of the certified branch." (Admin.File p. 25.)

[sic] adjacent to the General Motors plant." (Admin. File p. 39.)

However, at the hearing on May 24, 1967, Mr. Lutz had before him the statement of Mr. Merrill, attorney for Industrial State, who advised the Regional Comptroller of the Currency:

"It is true that there are, at the present time, two branches of the protesting bank in this area, one that was located sometime at the end of 1963, I believe, I think about a thousand feet north of the intersection of Sprinkle and Kilgore, on the western side of Sprinkle Road, which would place it in the City of Kalamazoo. *Since that time the branch has lost money, has lost deposits, in any event, and the branch is, in effect, being relocated to the one that is now immediately north of the location in question here, and I will leave with the board here copies of material which are commitments by Industrial State Bank to close the first of these two branches as soon as the construction on the second branch is completed, which I understand will be like June the 15th, in that area, so that I think that that is something that you would want to have clarified as to the status of the protesting bank in that area.*" (Tr. pp. 8, 9.) (Emphasis supplied.)

As we noted, supra, page 6, Industrial State closed its 4220 Sprinkle Road branch on June 15, 1967.

In addition, at the hearing in this case in Kalamazoo, Mr. Lake, attorney for First National, referred to each of the two locations of Industrial State in cross-examination of Mr. Francis Hamilton, President of Industrial State. Mr. Hamilton's testimony was that in the application for the second branch it was implied that if the two branches could not profitably survive, the first one would be closed. (Tuesday, April 2, 1968.)

First National holds approximately 47% of the deposits of the three major banks in the Kalamazoo area. (Admin. File p. 93.) *It has opened three branches in the past four years which are considered marginal.* (Admin. File p. 30.)

It now seeks to establish another branch, allegedly for the purpose of meeting the needs of a rapidly expanding industrial center. But its past performance suggests, contrary to its contentions, that its primary reason for seeking a branch is to compete with plaintiff's branch at the gate of the General Motors Fisher Body plant.

The thrust of the recommendations of Arthur K. Veldey, National Bank Examiner, Joseph G. Lutz, Regional Comptroller of the Currency, T. M. Brezinski, Director, Bank Organization Division, and R. J. Blanchard, Deputy Comptroller of the Currency, is that the First National is the largest bank in the community and that it should (as one of the leading Kalamazoo banks) be represented with a branch in the area in order to allow it to share in the growth of the area and maintain its competitive position. They imply that its competitive position is weakened because of the presence in the area of three other branches.

The precise, favorable and unfavorable, conclusions of three of these officials of the Comptroller are as follows:

Joseph G. Lutz, Regional Comptroller of the Currency, said:

"The proposed serving area is certain to gain momentum in the years ahead in residential and commercial growth as well as industrial chiefly by reason of the recent entry of General Motors with its Fisher Body Plant presently employing over 2,000 persons. In addition to this large General Motors Plant, there are six industrial concerns of substance employing in total near 1,300 persons all located within 1½ miles of proposed br. site. It is anticipated that the General Motors Plant will expand employment to in excess of 3,000 in the year 1968. The proposed new br. location is within the city limits and thus the matter of 'village' qualification is not an issue. *In view of the claimed volume of present activity generated from the proposed serving area and the most favorable growth factors, there is merit to bank's position that it should enjoy*

*representation with a br. in the area as one of the leading Kalamazoo banks. It is recommended that subject application receive favorable consideration."* (Admin. File p. 3, emphasis supplied.)

T. M. Brezinski, Director, Bank Organization Division, said:

"Area is one of positive growth and shows brisk activity. Branch is to be situated across from a plant of General Motors with additional industrial activity located nearby. On approval and opening, the bank's existing office at 5002 East Kilgore Road will be discontinued. Branch will allow applicant to share in growth and maintain its position." (Admin. File p. 4.)

R. J. Blanchard, Deputy Comptroller of Currency, said:

"The branch will be located in an important industrial section of metropolitan Kalamazoo where applicant claims a substantial volume of existing business. Since applicant was required by permanent injunction to close its Sprinkle-Kilgore branch, .6 mile south of the proposed site, it cannot provide convenient banking services to this area and *its competitive position is weakened because of the presence in the immediate area of two branches of a state bank and a branch of the American National."* (Admin. File p. 4, emphasis supplied.)

In Moran v. State Banking Commissioner, supra, the Michigan Supreme Court said:

" * * * we are of the opinion that the meaning or import of 'necessity' as embodied in the statute [M.S.A. § 23.-762] is a substantial or obvious need justifying the chartering of a new bank in view of the disclosed relevant circumstances." 322 Mich. at 244, 33 N.W.2d at 778.

Earlier in its opinion, the court said: " * * * convenience is not sufficient to satisfy the statutory requisite of 'necessity.' " 322 Mich. at 243, 33 N.W.2d at 778.

■ It is apparent from the conclusions of Messrs. Lutz, Brezinski and Blanchard, that little if any attention

was given to the standards set forth in the Moran case. In Michigan a bank must establish necessity before it can claim a right to have an opportunity to compete with its fellow banks.

Significantly, Stuart I. Greenbaum, Senior Economist of the Comptroller, observed:

"The merits of this application have been argued largely in terms of expected future needs of a growing area. In light of the March 1, 1967 opening of a branch of the Industrial State Bank but a few hundred feet from the proposed branch site, *present* needs and convenience arguments for this application are not strong. The remaining arguments offered on behalf of this application appear to be either of second-order importance or irrelevant." (Admin. File p. 4.)

We agree.

Section 34 of the Michigan Financial Institutions Act is binding as a matter of law upon the Comptroller.

■ Although the Comptroller does have broad discretion with respect to the matters committed to his charge, including branch banking, his position that he is not bound by state law is clearly untenable in light of the comments of Senators Glass and Vandenberg as discussed in First Nat. Bank of Logan, Utah v. Walker Bank & Trust Co., supra. The court said:

Senator Glass, the ranking member of the Senate Committee on Banking and Currency and the dominant banking figure in the Congress, was sponsor of the Act. In reporting it to the Senate for passage, he said, the Act "required that the establishment of branch banks by national banks in States which by law permit branch banking should be under the regulations required by State law of State banks." 7 Cong.Rec. 3726 (1933).

In a colloquy on the floor of the Senate with Senator Copeland as to the purpose of the Act (with reference to branch banking by national banks), Senator Glass said that it would be permissible "in only those States the

**908**

laws of which permit branch banking, and only to the extent that the State laws permit branch banking." Moreover, to make it crystal clear, when Senator Copeland replied that "it permits branch banking only in those States where the State laws permit branch banking by State banks," Senator Glass was careful to repeat: *"Only in those States and to the extent that the State laws permit branch banking."* (Emphasis added.) 76 Cong.Rec. 2511 (1933). Remarks of other members of Congress also indicate that they shared the understanding of Senator Glass. For example, Senator Vandenberg stated that § 36(c) (1) provides "that the branch-banking privilege so far as national banks are concerned shall follow the status established by State law in respect to the State privilege." 76 Cong. Rec. 2262 (1933).

385 U.S. at 259–260, 87 S.Ct. at 496.

 Accordingly, for the foregoing reasons the Comptroller's decision granting a certificate to First National Bank and Trust Company of Kalamazoo to establish a branch at 3450 Sprinkle Road, Kalamazoo, Michigan, is hereby reversed.

It is so ordered.