**CLERMONT NATIONAL BANK,**
**Plaintiff,**

v.

**CITIZENSBANK NATIONAL ASSOCIA-TION and William B. Camp, Comptroller of the Currency of the United States, Defendants.**

**Civ. A. No. 7987.**

United States District Court,
S. D. Ohio, W. D.
June 15, 1971.

Irving Harris, Cincinnati, Ohio, for plaintiff.

David H. Schneider, Milford, Ohio, for defendant Citizensbank.

Norbert A. Nadel, Asst. U. S. Atty., Cincinnati, Ohio, Peter J. P. Brickfield, Civil Div., Dept. of Justice, Washington, D. C., for defendant Wm. B. Camp.

## MEMORANDUM AND ORDER

HOGAN, District Judge.

In this action the plaintiff Clermont National Bank (hereinafter called "Clermont") sought a temporary and permanent injunction against the Comptroller of the Currency of the United States and the Citizensbank National Association, a National banking association of Felicity, Ohio (hereinafter called "Citizens") the effect of which would be to prevent Citizens from operating a branch in Milford (which has just attained City or 5,000 population status) Clermont County, Ohio. Alternately, the plaintiff seeks a temporary injunction with a remand to the Comptroller for further proceedings in compliance with law.

The Comptroller has filed a motion to dismiss and a motion for a summary judgment. The plaintiff's motion for a restraining order was heard on or about May 27, 1971, and neither granted nor denied. A hearing on the motion for a temporary injunction was had on June 3, 1971. In the interim Clermont had obtained a subpoena duces tecum and Citizens had filed a motion to quash it. At the hearing on June 3rd, the parties, all represented, agreed that upon the filing by the Comptroller in this case as Exhibits 1, 2, and 3—constituting the entire Administrative Record—there was no issue of fact before this Court and further agreed to submit the case on the merits on the record as it stood at the conclusion of the hearing. The various motions—commonly called preliminary sparring—are therefore mooted. If that be not so in respect of the motion to quash, it is unnecessary to pass on it to arrive at the conclusion on the merits. A merit submission prior to answer date is concededly a little unusual—however, there is no constitutional question leveled at the administrative process, nor is there any unfair hearing charge. (There scarcely could be in the light of the complimentary exchange reflected at pages 212, et seq., of the Transcript. [Def.Ex. 3]) Lacking such and/or any fact question, the scope of review of this Court is the same with or without an answer.

Two statutes, one federal and one state, are involved in this controversy. The relevant portions of the two are each Subsection (c). Subsection (c) of 12 U.S.C. § 36 provides as follows:

(c) A national banking association may, with the approval of the Comptroller of the Currency, establish and operate new branches: (1) Within the limits of the city, town or village in which said association is stituated, if such establishment and operation are at the time expressly authorized to State banks by the law of the State in question; and (2) at any point within the State in which said association is situated, if such establishment and operation are at the time authorized to State banks by the statute law of the State in question by language specifically granting such authority affirmatively and not merely by implication or recognition, and subject to the restrictions as to location imposed by the law of the State on State banks. * * * no such association shall establish a branch outside of the city, town, or village in which it is situated unless it has a combined capital stock and surplus equal to the combined amount of capital stock and surplus, if any, required by the law of the State in which such association is situated

for the establishment of such branches by State banks, or, if the law of such State requires only a minimum capital stock for the establishment of such branches by State banks, unless such association has not less than an equal amount of capital stock.

Subsection (C) of the Ohio statute, Revised Code Section 1111.03 provides in pertinent part as follows:

(C) In considering an application for a branch under division (A) of this section, the superintendent shall ascertain whether:

(1) The convenience and needs of the public will be served by the proposed branch;

(2) The population and economic characteristics of the area primarily to be served afford reasonable promise of adequate support for the proposed branch;

(3) The proposed branch meets such other reasonable criteria as he may require.

The fundamental question in this case is whether or not the requirements of these statutes were complied with in connection with the award by the defendant Comptroller to the defendant Citizens of authority to establish and operate a branch bank in Milford, Ohio. The question arises on these facts which we take, as we are required to do, from a complete review of the Administrative Record. The Administrative Record consists of Defense Exhibits 1, 2, and 3, containing about 1,000 pages, all of which have been reviewed by this Court. Exhibit 3 is the transcript of the adversary hearing held in Cleveland in April of this year before a panel consisting of the Regional Administrator of National Banks for the Fourth Region, the Senior National Bank Examiner and the Regional Counsel, designated by the Comptroller to "obtain clarification of the issues" and gather factual information tendered by the adversaries at that hearing, i. e., the two banks and their counsel. Any reference hereinafter to pages means pages in Exhibits 1 and 2, unless otherwise designated.

This controversy began over two years ago. While it involves the establishment by a little bank of a little branch in a little town, the controversy has produced thousands of pages of legalistic record and has received the services of a prominent law firm in Cleveland, two prominent law firms in Columbus, three prominent law firms in Cincinnati, and a young and aggressive law firm in Milford. It has been presented in one facet or another to the Ohio State Bank Board, the Ohio State Bank Examiners, The Ohio State Superintendent of Banks, the Franklin County, Ohio, Common Pleas Court, the Ohio State Court of Appeals for the Franklin County District, the Eastern Division of this Court, multi-levels of the Comptroller's Office, etc. The Citizensbank, at its commencement, had only one office and that was its home office in Felicity, Ohio, a small village in Clermont County, located some 34 miles from Milford. Felicity's Citizens balance sheeted at about a million and a half. Its capital accounts aggregated about $200,000. It wanted to establish a branch in Milford and filed an application with the Ohio State Superintendent of Banks for permission so to do— Citizens being then, of course, a State bank. At that time Milford was served by one bank—Clermont—which had at that time its home office and one branch in Milford. Since that time Clermont has been authorized by the Comptroller to establish a new main office approximately a mile and a half from its present main office and in the adjacent Miami Township. The new main office is a-building and, upon its completion, Clermont will move its home office to the new location, maintaining its old office as a branch. For our purposes, it may be considered that the Clermont has a home office and two branch offices in the area to be served by a Milford bank.

Some procedural difficulties relative to fairness or adequacy of preparation were encountered before the Ohio administrative authorities, which rule out

any possibility of applying the doctrine of collateral estoppel to the bank parties to this case. At that time there were five banks in Clermont County—a county which for our purposes may be considered as having a population of approximately 100,000. Clermont was and is the largest and the only one of the Clermont County banks which would have been competitive to the proposed new branch. Clermont then had approximately a $35 million balance sheet and operated some eight offices throughout Clermont County. Four of their seven branches were acquired by asset transactions with existing banks. Its business then represented about seventy-five percent of the County's banking business and some, if not all of its acquisitions, about which the Comptroller is chided, were in fact approved by the Comptroller.

The control of Citizens was acquired early in 1969 by a company called, "U. S. Grant Financial Corporation." That company was incorporated in Ohio in December, 1968, for that purpose, among others, and obviously the branch expansion was an initial purpose. It has sold stock to the public and we note in this record several things. The asset side of its balance sheet amounts to approximately $550,000 of which seventy percent is represented by the subsidiary Citizensbank. Grant, over a recent two-year period, lost some $40,000 and there appears on its asset side an item "Increase in Equity of Subsidiary—$50,-000.00." While it and its subsidiary addressed some monopoly charges at the plaintiff, Grant has engaged in some tie-selling, which, although of the primitive type, is quite monopolistic and it issued some stock in a manner sufficiently preferential and manipulative to involve it in a proceeding before the Ohio State Division of Securities for violation of the Ohio Blue Sky laws. It did manage to exculpate itself under the exculpative provisions of the Ohio statute, but nonetheless in the light of the expertise of its board, it is noteworthy.

Be that as it may, the Comptroller is peculiarly possessed of the expertise and authority to determine who is suitable to engage in expanded banking.

The State Superintendent of Banks granted to Citizensbank the authority in June of 1969. His determination was promptly appealed to the Common Pleas Court of Franklin County, Ohio, by Clermont. That Court, in December of 1969, in a one-page opinion, citing no authority, concluded that Clermont had no "standing" and dismissed the appeal; whereupon Clermont took two steps: First, it appealed the Common Pleas Court decision to the Court of Appeals and, second, it filed an action in the Eastern Division of this Court against the Ohio Bank Superintendent claiming that the Ohio statute, as construed by the Ohio Court, was federally unconstitutional. The Court of Appeals reversed the Common Pleas Court. We are not advised on what ground. We are informed that the reversal involved no construction of the Ohio statute involved in this case. As we shall see, the federal action became moot.

Thereafter Citizensbank nationalized, i. e., converted to a National Bank which, of course, mooted all the legalistic proceedings involving the proposed branch in Milford as a branch of a State bank. Thereafter, and in March of 1971, the Citizensbank, now a National Bank with its home office in Felicity, Ohio, filed an application with the defendant Comptroller to open a branch in Milford. Clermont County banks, as well as banks maintaining branches in Hamilton County, Ohio, anywhere close to the Clermont County line, were notified of the application. The only formal notice of protest was filed by the plaintiff, who likewise requested a public hearing. Only one other bank objected and that was a small bank in Clermont County out of the service area involved in this case. No other banking institution objected, nor did the Ohio State banking authorities, although they all had a right to do so.

The hearing requested by Clermont was held in Cleveland on April 20, 1971. The transcript is Exhibit 3 of this record. Citizensbank submitted some 17 exhibits (208–328) and Clermont submitted some 12 exhibits (83–207). The Secretary and Director of Citizens, as well as the Chairman of the Board of that bank (who also serves as President of Grant Financial) testified, as did the Executive Vice President and Cashier of Clermont (18–25, 30–31, 44–75, 137–157). A director of Clermont, who was vice president and managing officer of a building and loan association in Milford, testified (155–164), as well as a Dr. James G. Sheehan (169–209). Dr. Sheehan is an economic consultant with specialization in market research and analysis. At the conclusion of the hearing, as we have noted, each of the bank parties to this controversy stated affirmatively their satisfaction with what they regarded as an eminently fair hearing.

On May 25, 1971, the Comptroller gave formal approval to Citizens to open its proposed branch in Milford and immediately thereafter Citizens so did.

■ The Comptroller has argued in case after case, of recent years and months, that his approval of authority to a national bank to operate a branch may be questioned only on a basis on which his approval to operate a national bank could be. The argument was made as recently as two months ago in the Middle District of North Carolina in First National Bank v. Wachovia Bank & Trust Co. et al., 325 F.Supp. 523 (M.D.N.C. 1971). No court has agreed with that, and as a consequence, before the June 3rd hearing in this case, this Court indicated to the Comptroller that any such argument here would be useless. On at least two occasions the Supreme Court has said as clearly as can be that all of the tests and standards provided by state law must be regarded by and are applicable to the Comptroller in any decision of his on whether or not to authorize a branch to a national bank. The Supreme Court laid that question to rest in

First Nat. Bank of Logan v. Walker Bank & Trust Co., 385 U.S. 252, 87 S.Ct. 492, 17 L.Ed.2d 343 (1966). At page 261, 87 S.Ct. at page 497 the Court said:

"It would fly in the face of the legislative history not to hold that national branch banking is limited to those states the laws of which permit it, and even there only to the extent that the state laws permit branch banking."

*Walker Bank & Trust Co.* was a unanimous opinion and was cited with approval in both the majority and dissenting opinions in First Nat. Bank in Plant City v. Dickinson, 396 U.S. 122, 90 S.Ct. 337, 24 L.Ed.2d 312 (1969). So, there is simply no question that the Comptroller, in determining whether or not to permit a national bank to establish a branch in Ohio, must apply the standards set forth in Ohio Revised Code Section 1111.03—being the same standards to be applied by the Ohio State Superintendent of Banks in passing on the same type of question with relation to a state bank.

While that is clearly the law, the Comptroller simply will not agree with it. He has continued to maintain it is not the law in one after the other federal district and appellate courts, as we have seen as recently as April in North Carolina and for that matter in this case. It creates a rather anomalous situation in which a court is called upon to apply a standard to an administrative situation in which the administrator starts out by saying, "I am not bound by the standard and I refuse to make any conclusory finding in the areas dealt with in the state statute." It has lead to all sorts of results; for instance, one district court presented with it and likewise presented with a situation in which there was no state construction of its own statute, simply "abstained" or refused to decide the controversy, which lead to a reversal by the circuit and a mandate to consider it under federal law. Howell v. Citizens First Nat. Bank, 385 F.2d 528 (3rd Cir. 1967).

Another district court remanded proceedings to the Comptroller with direc-

tions to hold such further hearings as may be required and thereafter formalize findings with regard to the state law criteria and his reasons therefor. See First-Citizens Bank & Trust Co. v. Camp, 409 F.2d 1086 (4th Cir. 1969). That is the alternate relief prayed for by the plaintiff in this case.

Another court simply searched the administrative file in conjunction with the scope of review federal rules and came to a conclusion, which conclusion was approved by the Fifth Circuit in Sterling Nat. Bank of Davie v. Camp, 431 F.2d 514 (1970).

The matter becomes further complicated for this reason: Prior to 1966 or thereabouts, the Comptroller rendered no opinion in matters such as this and made no particular findings. In 1966 or thereabouts he did initiate the practice of rendering an opinion and "exposing the basis of his determination." That office lately has abandoned that practice and, while apparently it will do so upon a remand order for that purpose, it has not been initially "exposing the basis." That is true in this case. For the history see 409 F.2d at 1090 and Citizens Nat. Bank of Southern Maryland v. Camp., D.C., 317 F.Supp. 1389, at 1392. In this case the opinion and findings of the Comptroller consist of one word, "Approved."

Two comments: (a) For the reasons set forth in Sterling Nat. Bank of Davie v. Camp, 431 F.2d 514 (5th Cir., 1970), Congress appears to have "excused him from filing a written opinion expressing his reasons," and (b) it would be as helpful to a district court in this type of case to find such an exposure of compliance with criteria and reasons as it would be helpful to a court in determining whether a welfare recipient has been appropriately dealt with. Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970).

■ The preliminary and basic question of what to do requires a delving into the criteria of review by a district court in this type of case. The Sixth Circuit has dealt with this question in a series of cases. In Community Nat. Bank of Pontiac v. Saxon, 310 F.2d 224 (1962) the Court said that the question is whether the Comptroller's decision "is reasonable and based on substantial grounds and was not arbitrary, capricious * * an abuse of discretion, or otherwise not in accordance with law." In Warren Bank v. Camp, 396 F.2d 52 (1968) the Court said:

> "The standard of judicial review is set by the Administrative Procedure Act. The courts determine only whether or not the action of the administrator was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"

In that case the Sixth Circuit dealt with plaintiff's request for a de novo trial in this manner:

> "There appears * * * general agreement that a trial de novo is not required for every complaint where abuse of administrative discretion is pled."

Parenthetically, the Fourth Circuit has held flatly that no de novo proceeding should be involved in a situation where there has been a fair adversary hearing —with which we agree. First-Citizens Bank & Trust Co. v. Camp, 409 F.2d 1086, at 1094 (1969). See also the Fourth and Fifth Circuit cases, supra.

The Supreme Court has, and recently, dealt with the problem in Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). That case involved a one-word announcement by the Secretary of the Department of Transportation, approving a route location—without any opinion or findings, formal or informal, exposing the standard, the compliance, and the reasons. The Court said:

> " * * * Neither announcement approving the route and design of I–40 was accompanied by a statement of the Secretary's factual findings. He did not indicate why he believed there were no feasible and prudent alternative routes or why design changes

could not be made to reduce the harm to the park.

"Petitioners contend that the Secretary's action is invalid without such formal findings * * *.

"Even though there is no de novo review in this case and the Secretary's approval of the route of I–40 does not have ultimately to meet the substantial evidence test, the generally applicable standards of § 706 require the reviewing court to engage in a substantial inquiry. Certainly, the Secretary's decision is entitled to a presumption of regularity. See, e. g., Pacific States Box & Basket Co. v. White, 296 U.S. 176, 185 [56 S.Ct. 159, 163, 80 L.Ed. 138] (1935); United States v. Chemical Foundation, 272 U.S. 1, 14–15 [47 S.Ct. 1, 6, 71 L.Ed. 131] (1926). But that presumption is not to shield his action from a thorough, probing, in-depth review.

"The court is first required to decide whether the Secretary acted within the scope of his authority. Schilling v. Rogers, 363 U.S. 666, 676–677 [80 S.Ct. 1288, 1295–1296, 4 L.Ed.2d 1478] (1960). This determination naturally begins with a delineation of the scope of the Secretary's authority and discretion. L. Jaffe, Judicial Control of Administrative Action 359 (1965). As has been shown, Congress has specified only a small range of choices that the Secretary can make. Also involved in this initial inquiry is a determination of whether on the facts the Secretary's decision can reasonably be said to be within that range. The reviewing court must consider whether the Secretary properly construed his authority to approve the use of parkland as limited to situations where there are no feasible alternative routes or where feasible alternative routes involve uniquely difficult problems. And the reviewing court must be able to find that the Secretary could have reasonably believed that in this case there are no feasible alternatives or that alternatives do involve unique problems.

"Scrutiny of the facts does not end, however, with the determination that the Secretary has acted within the scope of his statutory authority. Section 706(2) (A) requires a finding that the actual choice made was not 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' 5 U.S.C. § 706(2) (A) (Supp. V). To make this finding the court must consider whether the decision was based on a consideration of the revelant factors and whether there has been a clear error of judgment. L. Jaffe, supra, at 182. See McBee v. Bomar, 296 F.2d 235, 237 (CA6 1961); In re Josephson, 218 F.2d 174, 182 (CA1 1954); Western Addition Community Organization v. Weaver, 294 F.Supp. 433 (N.D.Cal.1968). See also Wong Wing Hang v. Immigration & Naturalization Serv., 360 F.2d 715, 719 (CA2 1966). Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

"The final inquiry is whether the Secretary's action followed the necessary procedural requirements. Here the only procedural error alleged is the failure of the Secretary to make formal findings and state his reason for allowing the highway to be built through the park.

"Undoubtedly, review of the Secretary's action is hampered by his failure to make such findings, but the absence of formal findings does not necessarily require that the case be remanded to the Secretary. Neither the Department of Transportation Act nor the Federal-Aid Highway Act requires such formal findings. Moreover, the Administrative Procedure Act requirements that there be formal findings in certain rulemaking and adjudicatory proceedings do not apply to the Secretary's action here. See 5 U.S.C. § 553(a) (2) (Supp. V); 5 U.S.C. § 554 (a) (Supp. V). And, although formal findings may be required in some

cases in the absence of statutory directives when the nature of the agency action is ambiguous, those situations are rare. See City of Yonkers v. United States, 320 U.S. 685 [64 S.Ct. 327, 88 L.Ed. 400] (1944); American Trucking Assns. v. United States, 344 U.S. 298, 320 [73 S.Ct. 307, 319–320, 97 L.Ed. 337] (1953). Plainly, there is no ambiguity here; the Secretary has approved the construction of I–40 through Overton Park and has approved a specific design for the project. * * *

" * * * Moreover, there is an administrative record that allows the full, prompt review of the Secretary's action that is sought without additional delay which would result from having a remand to the Secretary.

"That administrative record is not, however, before us. The lower courts based their review on the litigation affidavits that were presented. These affidavits were merely 'post hoc' rationalizations, Burlington Truck Lines v. United States, 371 U.S. 156, 168–169 [83 S.Ct. 239, 245–246, 9 L.Ed.2d 207] (1962), which have traditionally been found to be an inadequate basis for review. Burlington Truck Lines v. United States, supra; SEC v. Chenery Corp., 318 U.S. 80, 87 [63 S.Ct. 454, 459, 87 L.Ed. 626] (1943). And they clearly do not constitute the 'whole record' compiled by the agency: the basis for review required by § 706 of the Administrative Procedure Act. See n. 30, supra.

"Thus it is necessary to remand this case to the District Court for plenary review of the Secretary's decision. That review is to be based on the full administrative record that was before the Secretary at the time he made his decision. But since the bare record may not disclose the factors that were considered or the Secretary's construction of the evidence it may be necessary for the District Court to require some explanation in order to determine if the Secretary acted within the scope of his authority and if the Sec-

retary's action was justifiable under the applicable standard."

Applying the *Volpe* decision to the facts of this case—there is no question that the action taken by the Comptroller was within the scope of his general authority under the law. Nor is there any question that his action followed all necessary procedural requirements. The sole question is: Was the Comptroller's choice between approving and disapproving arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law—were the relevant factors considered and was there clear error of judgment? Or perhaps stated in another way—despite the fact that the Comptroller refuses to apply the Ohio standards, did he in effect apply the factors involved in those standards and was his application capricious, etc.?

There is no question at all in this record that the capital requirements imposed by Ohio law for a branch bank have been complied with, so they will be neither stated nor otherwise referred to. The Ohio Superintendent of Banks has not elaborated on requirement (3), i. e., "The proposed branch meets such other reasonable criteria as he may require." If he has, there is no evidence of it in this case. Lacking elaboration by administrative construction, administrative rulings, administrative action, or court construction, that particular standard causes no trouble. No one would know to what it is to apply. It is the other two standards that are involved in this case; the first being: Will the proposed branch serve the convenience and needs of the public? The second is, of course, Do population and economic characteristics of the area primarily to be served afford reasonable promise of adequate support for the proposed branch? There is no substantial controversy about that second requirement in this record. In the first place, the Comptroller approved and adopted the recommendations made by his staff, so it is clear that the Comptroller found (pg. 9):

"In view of the very good past residential growth in the service area, the

excellent future growth potential of the service area, and the other favorable factors, I respectfully recommend approval * * * "

This is a finding of a "reasonable promise of adequate support." The Deputy Comptroller in recommending approval concluded:

"The service area, which is contiguous to greater Cincinnati, has experienced rapid growth and stands to benefit materially from improved access routes and aggressive efforts of various county planning commissions."

That, too, is such a finding. There is ample support throughout the administrative record. For instance, in the county involved, real estate tax collections in the ten years previous to 1969 went from approximately $3 million to approximately $9 million. During that same period, while an existing bank branched, no new bank was formed. In 1968 the deposits of the Clermont National increased by $5 million. That is a rather remarkable growth for a bank whose balance sheet in 1970 approximated $46 million. The State Bank Examiner who made an examination of the situation in 1969, directed himself pointedly to the question in his report to the Superintendent, indicating that a proposed branch of the Citizensbank at Milford "should be successful." (See pages 290, et seq.; 589, et seq.) True it be that there was testimony contra indicating that future growth would be limited. But, as usual, this was a battle for the experts. The opposing expert indicated that the portions of the County containing Miami Township and Milford, which were expected to grow, had increased in population more that 90% in the 1950–60 decade; that the growth had slowed in that area to 33% in the decade 1960–70; and that because of various programs in progress, etc., the increase for 1970–80 would reflect a growth of "approximately 141.7%." (Pg. 406) Further, the application and proceedings before the Comptroller indicate repetitively that the prospects

for gain and loss, turnover, etc., were specifically dealt with and considered. The choice between conflicting evidence of "promise" is peculiarly for the expertise of the administrator. His conclusion of "reasonable promise of adequate support" expressed in equivalent or implied language was certainly based on substantial evidence and was not capricious or arbitrary in any sense.

The heaviest guns of the plaintiff are leveled at requirement (1), i. e., that there is no finding, implied or express, by the Comptroller that the convenience and needs of the public will be served by the proposed branch. The plaintiff contends that that language means this: The Comptroller may not authorize a branch in a service area if the banking needs of the inhabitants of that service area are fully and adequately being met at the time. If that is the meaning of that section, the plaintiff should prevail. This record is absolutely clear that at this time, as well as at all times of interest here, the banking needs of the service area, i. e., the area in Milford and the area in the County in the general neighborhood of Milford, are being fully and adequately met by the existing banking facilities, meaning the banking facilities provided and to be provided by Clermont National, as well as its competitors from Cincinnati who maintain branches close to the service area. We need look no further—if one would look for something affirmative in reviewing a record—than the testimony of the President of Citizensbank in the Cleveland hearing, in which he testified in answer to the question:

"Has the banking industry in Milford and Miami Township area kept pace with the growth of Milford and Miami Township?

"A. Yes, yes it has kept pace with the growth, and certainly this is exemplified by the physical expansion." (Tr. pg. 62)

Furthermore, a market analysis recently made by an expert whose testimony in

this field was uncontradicted, indicated that people in the County, when asked what they would complain about not having, complained just about everything except banking. There is nowhere in the record one speck of testimony or evidence to the effect that the present banking needs of the inhabitants of the service area are not being effectively met. The Comptroller made no such finding either express or implied and such a finding, if one had been made, would certainly have been arbitrary and capricious.

What the Comptroller did find bearing upon this question was this:

"It is evident that Clermont National Bank, with resources of $43.9 million and operating eight offices, substantially dominates commercial banking within Clermont County. * * *

"In my opinion, an extremely unhealthy competitive situation presently exists and a strong public need is evident within the Milford area for a banking alternate to Clermont National * * * Approval will bring about competition * * * Introduction of competition is needed and would clearly be in the public interest." (Pgs. 9, 10)

The service area involved here as of 1970 contained approximately 32,000 inhabitants, approximately 5,000 being in Milford and approximately 27,000 being in the adjacent Miami Township area. (Tr. 200) The rate of growth of that Township would be in the highest ten percent nationally in the past decade or so. It has one bank which will be doing business at three locations. Multi-location is not the important thing—the important factor is that as it stood prior to the Comptroller's approval, there was one bank in the locality. Concededly the one bank had competition in some financial matters from other financial institutions, such as B & L's etc., located in the area and it had general competition from the branches of the Cincinnati banks near the service area. As we shall see, neither is an effective answer to the competition problem—nor are they both.

The defendant's position essentially is that the provision of competition or the prevention of a local monopoly is in and of itself a sufficient basis for a finding or conclusion that the convenience and needs of the public will be served by a new branch. The plaintiff disputes that and that is the real issue in this case. The plaintiff does not dispute that there is no *local* banking competition—it cannot. The simple inescapable fact is that there is one banking entity in the service area of 32,000 people. At the hearing, this Court sustained an objection to a statistical study of banking in Ohio. That ruling is reversed and that study is admitted for what light it may shed on the construction of the Ohio administrative officials on Ohio's statute. According to that survey, Milford has a population of 4,800. There are 51 communities in Ohio in the 3,000 to 7,000 population range. If those, 36 have one bank, 14 have two banks, and one has three banks. The compilation has very little, if any, weight. In this field one deals in service areas and not in towns and we are not informed what service areas containing 30,000 people in Ohio have one bank, nor are we informed of the relevant factors in the various communities, e. g., how many of them are close to a rapidly growing township which has recently seen 100% growth in a decade.

In the view of this Court, the providing of competition in the banking, as well as any other business—or if one would state it the other way: the prevention of a de facto monopoly, locality-wise —"serves the convenience and needs of the public" for these reasons:

First—the statute itself indicates that we are dealing with something broader or more inclusive than the needs of the people in the service area. In other words, Part 2 of the Ohio subsection sets up a standard specifically related to the population and economic characteristics "of the area primarily to be served," i. e., the service area. Part 1 on the other hand deals with the convenience and needs—not of the population

of the area primarily to be served—but "of the public." As the Court pointed out in Citizens Nat. Bank of Southern Maryland v. Camp, 317 F.Supp. 1389 (D.C.Md.1970), dealing with a Maryland statute setting forth a standard of "public convenience and advantage," those words "mean something more than the convenience and advantage of the applicant bank and its existing customers at some other branch."

■ Second, the Sixth Circuit has indicated in American Bank & Trust Co. v. Saxon, 373 F.2d 283 (1967), that the construction placed on the phrase by the state courts is relevant. There is a difference between the Circuits on that —see 385 F.2d 528, supra. The Ohio courts have never been called on to construe the language, "convenience and needs of the public" in the section we deal with. The exact language, of course, is one of the many derivatives from the Ciceronian phrase, "de bono publico." The various derivations are slightly different—they all mean about the same thing. In the public utility field the equivalent in Ohio is "a certificate of convenience and necessity." The argument has been made in the Supreme Court of Ohio that inquiries should be confined "to the question whether the general public of the vicinity sought to be served is being adequately served by other" utilities. Utilities, like banking, is a highly regulated field. That argument is practically the same as the plaintiff is making in this case— that "public" means the "public of the vicinity sought to be served," i. e., that a new utility, such as a bus line, may be authorized only on a showing that present utilities are not serving the immediate utility needs of people in the vicinity. In McLain v. Public Utilities Commission, 110 Ohio St. 1, 143 N.E. 381 (1924), the Supreme Court of Ohio said this:

"* * * nor do we concur in the view of those courts who have expressed the view that any public utility requirement has for its purpose 'the establishment of a policy of protecting * * * existing * * * interest.' Nor, indeed, do we concur in any policy of protecting any existing public utility against competing public utilities, but consider, rather, that it is the policy of the federal government and the governments of the various states by legislation to secure to the general public * * * adequate service * * *.

"The court in that case seemed to lose sight of the fact that the purpose of regulation of public utilities is the benefit to the general public * * *. "* * * The quoted sentence does not require the construction that the legislation was intended to ripen into a vested right the permissive use by a bus line of the * * * highways of this state, or to confer upon such bus line a monopoly * * *"

The Supreme Court of Ohio in that case, which has been repeatedly referred to and affirmed, indicates that in Ohio the phrase, "convenience and needs of the public," is bound by no area. In passing, it is emphasized that in this respect this case differs sharply and materially from First National Bank v. Wachovia Bank & Trust Co., U. S. District Court, Middle District of North Carolina, 325 F.Supp. 523, above referred to. The state statute involved in that case used the language, "needs and * * * convenience of the community." If the Ohio statute read that way, i. e., if it read that the standard was the needs and convenience of the people of Milford, this would be a somewhat weaker case from the defendant's point of view. "Public" being the public at large, the situation of the banking needs of a particular community is not overally conclusive on the question. Furthermore Ohio has long exhibited a statutory policy against activities tending to lessen competition. The Valentine Act (R.C. 1331.01, et seq.) has been on the books for more than a half century and obviously exhibits a policy which favors competition.

Third—it is clear enough, since the Ohio courts have not construed the sec-

tion, the Comptroller is free to do so and is, furthermore, free to adopt any reasonable construction that the statute setting forth the standard may bear. Since that statute in effect is adopted by Section 36 of the federal law, it is tantamount to a federal administrative official construing a federal statute which he is charged to administer and enforce.

In the very recent case of Investment Co. Institute v. Camp, 401 U.S. 617, at page 626, 91 S.Ct. 1091, at page 1097, 28 L.Ed.2d 367 (1971) the Supreme Court said this:

> "It is settled that courts should give great weight to any reasonable construction of a regulatory statute adopted by the agency charged with the enforcement of that statute. The Comptroller of the Currency is charged with the enforcement of the banking laws to an extent that warrants the invocation of this principle with respect to his deliberative conclusions as to the meaning of these laws."

We cannot say that a construction which reads an anti-monopoly purpose into Subsection 1 of the Ohio statute is at all unreasonable.

If any emphasis were needed on the reasonableness, one could point to this: The Ohio State Chief Examiner of Banks on May 5, 1969 (583 and following) noted this:

> "In general the individuals interviewed felt that they are getting good banking services now, but appeared to have the feeling that a little competition might be a good thing."

And one of the five conclusions which furnished the basis for his recommendation was this—and it was the first one—

> "A branch office in Milford would create needed competition."

So, we have the administrative construction of both the federal and state administrative agencies to the effect that, in the determination of what will serve "the convenience and needs of the public," the providing of competition is a very important factor.

Fourth—The Supreme Court of the United States has recently dealt at length with the thesaurus, "Meeting the convenience and needs of the community," in United States v. Phillipsburg National Bank & Trust Co., 399 U.S. 350, 90 S.Ct. 2035, 26 L.Ed.2d 658 (1970). In that case the United States successfully enjoined as a violation of the Clayton Act the merger of two banks in Phillipsburg, New Jersey. The population of Phillipsburg at the relevant time was 18,500 for Phillipsburg proper and 28,500 including the population of its bordering suburbs. Phillipsburg was somewhat bigger than Milford, however, the bordering area was somewhat smaller than Milford's. Phillipsburg, like Milford, had not grown much in a long time. There is another town across the river from Phillipsburg, called Easton, and its included suburban population amounted to about 60,000. This "one town" had seven commercial banks, four in Easton and three in Phillipsburg. Two of these sought to merge and the merged bank would have been the second largest. Now, of course, the direct question in the Phillipsburg case is considerably different from the direct question in this case, but that case and this one had this in common: what is relevant to the public convenience and needs and what serves it and what does not. The Supreme Court said this:

> " * * * Mergers of directly competing small commercial banks in small communities, no less than those of large banks in large communities, are subject to scrutiny under these standards. Indeed, competitive commercial banks, with their cluster of products and services, play a particularly significant role in a small community unable to support a large variety of alternative financial institutions. Thus, if anything, it is even more true in the small town than in the large city that 'if the businessman is denied credit because his banking alternatives have been eliminated by

mergers, the whole edifice of an entrepreneurial system is threatened; if the costs of banking services and credit are allowed to become excessive by the absence of competitive pressures, virtually all costs, in our credit economy, will be affected * * *'

"*Philadelphia Bank* [United States v. Philadelphia Nat. Bank][1] emphasized that it is the cluster of products and services that full-service banks offer that as a matter of trade reality makes commercial banking a distinct line of commerce. Commercial banks are the only financial institutions in which a wide variety of financial products and services—some unique to commercial banking and others not—are gathered together in one place. The clustering of financial products and services in banks facilitates convenient access to them for all banking customers. For some customers, full-service banking makes possible access to certain products or services that would otherwise be unavailable to them; the customer without significant collateral, for example, who has patronized a particular bank for a variety of financial products and services is more likely to be able to obtain a loan from that bank than from a specialty financial institution to which he turns simply to borrow money. In short, the cluster of products and services termed commercial banking has economic significance well beyond the various products and services involved.

"Customers of small banks need and use this cluster of services and products no less than customers of large banks. A customer who uses one service usually looks to his bank for others as well, and is encouraged by the bank to do so. * * *

"Moreover, if commercial banking were rejected as the line of commerce for banks with the same or similar ratios of business as those of the appellee banks, the effect would likely be to deny customers of small banks —and thus residents of many small towns—the antitrust protection to which they are no less entitled than customers of large city banks. Indeed, the need for that protection may be greater in the small town * * *.

"Commercial realities in the banking industry make clear that banks generally have a very localized business. We observed in *Philadelphia Bank*, supra, at 358 [83 S.Ct., at 1738], that '[i]n banking, as in most service industries, convenience of location is essential to effective competition. Individuals and corporations typically confer the bulk of their patronage on banks in their local community; they find it impractical to conduct their banking business at a distance * * *' * * * although the city is sufficiently small that there is easy access to its downtown area where the banks have their main offices, the banks found it necessary to open branches in the suburbs because, as a witness testified, that is 'where the customers are.' See also *Philadelphia Bank*, supra, at 358 n. 35 [83 S.Ct., at 1738]. The 'one town' banks generally compete for deposits within a radius of only a few miles.

"The localization of business typical of the banking industry is particularly pronounced when small customers are involved. We stated in *Philadelphia Bank*, supra, at 361, [83 S.Ct., at 1740] that 'in banking the relevant geographical market is a function of each separate customer's economic scale'—that 'the smaller the customer, the smaller is his banking market geographically,' id., at 359 n.

---

1. 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed. 2d 915. This case disposed of the argument that building associations and finance companies and other financial institutions can supply competition to commercial banking. Some, yes; all, no.

36 [83 S.Ct., at 1739]. *Small*[2] *depositors have little reason to deal with a bank other than the one most geographically convenient to them. For such persons, geographic convenience can be a more powerful influence than the availability of a higher rate of interest at a more distant, though still nearby bank. The small borrower, if he is to have his needs met, must often depend upon his community reputation and upon his relationship with the local banker.* PNB, for instance, has made numerous unsecured loans on the basis of character, which are difficult for local borrowers to get elsewhere. And, as we said in *Philadelphia Bank,* supra, at 369, [83 S.Ct., at 1745] '[s]*mall businessmen especially are, as a practical matter, confined to their locality for the satisfaction of their credit needs. * * * If the number of banks in the locality is reduced, the vigor of competition for filling the marginal small business borrower's needs is likely to diminish.'* Thus, the small borrower frequently cannot 'practicably turn for supplies' outside his immediate community; and the small depositor—because of habit, custom, personal relationships, and, above all, convenience—is usually unwilling to do so. * * * (Emphasis ours.)

"Appellee banks argue that Phillipsburg-Easton 'cannot conceivably be considered a "market" for antitrust purposes,' on the ground that it is not an 'economically significant section of the country.' * * * In *Brown Shoe,* however, we found 'relevant geographic markets' in cities 'with a population exceeding 10,000 and their environs.' * * *

" * * * Thus, we find on this record that the proposed merger, if consummated, 'is * * * inherently likely to lessen competition substantially.' * * * "

Cases such as *Philadelphia Bank, Phillipsburg Bank,* and the *Lexington, Kentucky, Bank* [United States v. First Nat. Bank & Trust Co. of Lexington, 376 U.S. 665, 84 S.Ct. 1033, 12 L.Ed.2d 1] cases are clear authority for the statement that competition serves the convenience and needs of the public. One way to provide competition is to prevent competitors in the banking field from merging; another and just as effective a way is to provide for a new entity. The result in either case is the same to John Q. Public—providing competition.

■ Both explicitly in the administrative record, in the Comptroller's approval of the explicit recommendations of his staff,[3] and implicitly in the entire administrative record, the conclusion was reached that Subsection 1 of the Ohio statute would be met because needed competition would be provided. True, one does not find it in the language of the Ohio statute. But that is not necessary. As the Fourth Circuit said in First-Citizens Bank & Trust Co. v. Camp, 409 F.2d 1086,

" * * * The Comptroller's construction of the North Carolina 'need and convenience' criterion is to be inferred from his findings * * * which he concluded supported his ultimate finding * * *

" * * * He viewed the area, particularly of the rapid growth and expansion to the north, as a dynamic community and, not unreasonably, we believe, undertook to predict future needs and conveniences, as well as those existing at the time that the applications were before him. * * * The grant of an application to open

2. As of December, 1970, "the overall average of all of Clermont National's accounts, including business, governmental, etc. was $1,156.00; the average of all regular accounts was $698.00, and the average of all special accounts was $340.00." (p. 62)

3. The Comptroller's standard instructions to Examiners in re new branch applications directs inquiry into "all the pertinent economic factors, such as composition of population, economic growth and banking needs of the community." (D. Ex. 4)

a branch bank is significant not only for today but also for tomorrow. Manifestly, it is proper to consider tomorrow in concluding what should be done today.

"Nor do we find error in [his] failure to make definitive specific findings with regard to the service area, economic feasibility, public needs, and quality and quantity of existing service. * * * Overall, we cannot say that the Comptroller's construction of the North Carolina law was unreasonable."

Implicit findings evident in the administrative record, culminating in the simple opinion "Approved," are sufficient. See Sterling Nat. Bank of Davie v. Camp, 431 F.2d 514 (5th Cir. 1970) in which the Court said in dealing with such:

"* * * Bank was given a full and fair hearing to express its opposition * * * The Comptroller decided against its position. Although we cannot chart the subjectives of his discretionary decision, it was obviously based on a composite of many factors and much data. To say that one fact was erroneous and that another fact was askew is not to infest the Comptroller's exercise of discretion with the scent of arbitrariness or capriciousness sufficient to set aside his decision. * * *"

See also Industrial State Bank & Trust Co. v. Camp, 284 F.Supp. 900 (D.C. Mich.1968)—reversed on other grounds, 421 F.2d 1361 (6 Cir., 1970), in which the Court said:

"The Comptroller did not expressly make a finding on necessity in approving defendant First National's application for a branch bank. We recognize that such a finding could be implicit in his decision and that if there is substantial evidence to support such a finding his action must be affirmed."

As mandated by *Volpe* and the Sixth Circuit's decision referred to previously and reported in 396 F.2d 52,

this Court has carefully reviewed the entire administrative record in this case in the manner required by Section 706 of the Administrative Procedures Act, Title 5. It is not for this Court to agree or disagree with his conclusions. His conclusions were in accordance with law, i. e., in an area in which he had authority, and involved the application of correct legal standards. Those conclusions were supported by substantial evidence, should that test be considered applicable; more directly and more importantly, the conclusions were not arbitrary or capricious or in any abuse of discretion. After all, there comes a time when someone must decide, in a reasonable fashion and applying correct standards of law, when the time has come for competition in a regulated industry. That ultimate decision is placed by our system of government in an administrative authority who has broad discretion—as it should be—since no one will ever really know. If that discretion is exercised on a substantial basis, applying correct legal standards, certainly the judicial power should not interfere with the expertise of the administrative agency—after all, that is where the expertise is.

For the above reasons, the complaint is dismissed at the plaintiff's costs.